Original
No. 86-042

PETITION OF WILLIAM L. CHAPMAN

May 8, 1986

*William L. Chapman*, of Concord, by brief and orally, pro se.

*Upton, Sanders & Smith*, of Concord (*Richard F. Upton* on the brief and orally), for the New Hampshire Bar Association.

*Joseph A. Millimet & a.*, of Manchester, by brief, as intervenors in support of petitioner.

*Robert J. Lynn*, of Concord, and *Ransmeier & Spellman*, of Concord (*Joseph S. Ransmeier & a.*), as intervenors in support of petitioner.

BROCK, J. (with whom SOUTER and JOHNSON, JJ., concur). The petitioner, William L. Chapman, Esq., invokes the original jurisdiction of this court, SUP. CT. R. 11, in requesting an order directing the New Hampshire Bar Association (the Association) to comply with the terms of its constitution and with the limitations as to its legislative activities placed upon it by *In re Unification of the New Hampshire Bar*, 109 N.H. 260, 248 A.2d 709 (1968) and *In re Unified New Hampshire Bar*, 112 N.H. 204, 291 A.2d 600 (1972). The petitioner specifically requests that we enjoin the Association from continuing actively to oppose the so-called "tort reform" legislation currently pending before the General Court.

On January 9, 1986, the Board of Governors of the Association (the Board) voted to oppose several bills, collectively known as "tort reform" legislation. These bills comprise a package of provisions which is designed to change procedural and substantive tort law as it affects the rights of persons to recover for their injuries and also the attorney-client relationship generally. The petitioner requested reconsideration of that vote in a letter dated January 23, and was notified on January 30 that the Board had done so and had voted to continue opposing the legislation. He thereafter filed his petition with this court on February 5.

■■ We consider first the Association's procedural challenges to the petition. We are of the opinion that Attorney Chapman's request for reconsideration was sufficient to exhaust his administrative remedies in that if the Board reaffirmed its position on the tort law package, it would have been unlikely to call a special meeting of the Association as a whole or to permit a referendum. A party is not required to pursue administrative remedies when to do so would likely be a useless act and result in delays that might make his or her claim moot. See R. WIEBUSCH, 5 NEW HAMPSHIRE PRACTICE, CIVIL PRACTICE AND PROCEDURE § 2083 (1984). The petitioner presented his grievance to the Board, thereby affording it an opportunity to reconsider its position, and to alter it if the Board felt compelled to do so. In addition, we find that the petitioner presented his views to the Board with sufficient specificity for us to reach the merits of his claim. See Abood v. Detroit Board of Education, 431 U.S. 209, 241 (1977).

The petitioner makes two arguments in support of his position. First, he argues that the Board exceeded its authority in deciding to oppose tort revision legislation before the legislature. The Association, he asserts, is limited in its legislative activities by the provisions of its constitution and by decisions of this court. Article I of the Association's constitution states that "[t]he Association shall confine its activities before the General Court to those matters which are related directly to the administration of justice; the composition and operation of the courts; the practice of law and the legal profession." N.H. BAR ASSN. CONST. art. I. The petitioner claims that the Association has violated this standard in the fact of, and in the manner by which it has manifested, its opposition to the legislation at issue here.

The purposes of the Association

"are to improve the administration of justice; to foster and maintain high standards of conduct, integrity, competence and public service on the part of those engaged in

the practice of law; to safeguard the proper professional interests of the members of the Bar; to provide a forum for the discussion of subjects pertaining to the practice of law, the science of jurisprudence and law reform and the relations of the Bar to the public; to carry on a continuing program of legal research and education, and to encourage cordial relations among members of the Bar; all to the end that the public responsibility of the legal profession may be more effectively discharged."

*Id.* Article V, section 4 states:

"Between meetings of the Association the Board of Governors shall be the governing body of the Association, and shall have the power and authority to do and perform all acts and functions which the Association might itself do or perform, not inconsistent with the Rules of the Supreme Court, this Constitution and the By-laws or with any action taken by the Association."

*Id.* at art. V, sec. 4. The issue with which we are confronted, then, is whether the Board's decision to oppose tort reform is "inconsistent" with the powers and authority conferred upon the Association.

In *In re Unification of the New Hampshire Bar*, 109 N.H. 260, 248 A.2d 709, a divided court recognized the constitutionality of an integrated bar and ordered a trial unification period of three years. In its opinion, the majority recognized the concerns of opponents to unification that an integrated bar could take positions on legislation pending before the General Court. In response to those concerns, the court stated that

"[t]he Association's brief recognizes that because of this prerogative of the unified Bar 'officers and other leaders have an obligation to be more circumspect in respect to "political" issues that are not clearly within the realm of the administration of justice.' . . . [W]e are of the opinion that a unified Bar . . . should confine its activities in this sphere to legislation dealing with administration of justice, the operation of the courts, the practice of law, and the legal profession. . . .

The views expressed in those domains being those of the organization, an individual attorney is still free to voice his own views on any subject in any manner he wishes. . . . In addition thereto, if the activities of the unified Bar deviate substantially from the fields previously mentioned, an individual member, or a group thereof, can always seek judicial relief."

*Id.* at 266, 248 A.2d at 713 (citations omitted).

In this court's later decision to continue unification of the bar, over qualms expressed in the dissent of Grimes, J., a majority of the court, clearly intending to set limits on the permissible legislative activities of the Association, emphasized that, "there is no purpose to engage in purely partisan matters before the legislature, but rather to confine the activities of the association to issues related to the 'particular interests and competence' of lawyers." *In re Unified New Hampshire Bar*, 112 N.H. at 207, 291 A.2d at 601 (citation omitted).

■■ In resolving the issue before us, we begin our analysis by delineating a spectrum along which the legislative activities of the Association could conceivably fall. At one end are purely partisan issues, upon which the Association *qua* Association may not take a position before the legislature. For example, the Association could not take an official position on a bill to repeal the so-called "anti-CWIP" law. At the other end are matters which clearly affect access of the public to the courts through the legal profession, such as proposed limitations on contingent fees, *see* HB 329-FN, and upon which the Association may therefore quite legitimately take a collective position. The ends of the spectrum are more easily defined than the point within it marking the limit of legitimate lobbying activity. No magic word or phrase or even discussion will fully resolve the problem presented. Words and principles are not self-limiting by their very nature. They require interpretation and application for their meaning to become clear. But an exercise of judgment will always be necessary when an individual case comes close to the more generally defined limitation.

Moreover, we note that it must be understood by the Association that a unified or integrated bar is qualitatively different from a voluntary bar. Quite obviously, the distinction between the two is that membership in the former is compulsory, whereas membership in the latter is voluntary. In effect, one is not at liberty to resign from a unified bar; by doing so, one loses the privilege to practice law.

As a result, other than resorting to whatever opportunities are available for internal dissent, the only avenue effectively open to the attorney who wishes to disassociate himself or herself from a position taken by the unified bar is to publicly express his or her personal opposition to that position. By contrast, a dissenting member of a voluntary bar association may either resign from the association or express openly his or her opposition to its position, or both, as circumstances may warrant. Thus,

> "the leadership of the bar would be wise to remember that
> the bar is a 'unified' bar, not a voluntary bar, and that a

unified bar has more limited functions and different responsibilities than a voluntary bar. Before voting for any expenditure or any project, the leaders of the bar should ask themselves whether they can justify that expenditure or project as a professional obligation of all lawyers. An expenditure or project appropriate for a voluntary association of lawyers is not necessarily appropriate for a 'unified' bar."

*Report of the Committee to Review the State Bar,* 112 Wis. xix, xxxix, 334 N.W.2d 544, 555 (1983) (Abrahamson, J., concurring).

It is here that the petitioner's second argument, a federal constitutional claim, becomes relevant. He asserts that, by taking a position on the tort package, the Association has violated his right to freedom of speech and what he terms his "rights of conscience" under the Federal and State Constitutions, U.S. CONST. amends. I, XIV; N.H. CONST. pt. I, arts. 4 (1970), 22 (Supp. 1985). The federal right that he asserts is part of that category known as "negative first amendment rights," which may be defined as the right to be free from "government action [compelling one] to associate and . . . to participate in certain forms of expression." *Falk v. State Bar,* 418 Mich. 270, 282–83 & n.12, 342 N.W.2d 504, 507 & n.12 (1983), *cert. denied,* 105 S. Ct. 315 (1984); *see also* Gaebler, *First Amendment Protection Against Government Compelled Expression and Association,* 23 B.C.L. REV. 995, 995–96 (1982).

At the outset, we note that the constitutionality of the integrated, or unified, bar is not at issue here. In addition to the fact that the history of the unified bar since its creation is one of impressive accomplishment and service to the public and lawyers of our State, the success of such a challenge is made all the more unlikely by decisions of both the United States Supreme Court and this court. *See Lathrop v. Donohue,* 367 U.S. 820 (1961); *In re Unification of the New Hampshire Bar,* 109 N.H. at 264, 248 A.2d at 712; *see also* Note, *First Amendment Proscriptions on the Integrated Bar: Lathrop v. Donohue Re-examined,* 22 ARIZ. L. REV. 939, 940 (1980). The Association has played a crucial role in maintaining and upgrading the quality of the bar in New Hampshire. The lawyer referral network has increased the availability of, and access to, lawyers in this State. Its public education and information efforts have been exemplary, and its continuing education program is among the best. The various committees of the Association provide substantive and procedural assistance both to the bar and to the courts. Unification of the bar may not be the sole reason for these successes, but we are confident that it has played a substantial role in contributing to these accomplishments.

The gravamen of the petitioner's federal constitutional argument is that this legislative activity by the Association is unrelated to the Association's legitimate aim of promoting "the educational and ethical standards of the Bar to the end of improving the quality of the legal service available to the people of the State, without any reference to the political process[,]" *Lathrop, supra* at 843, and violates the first amendment. The petitioner asserts that no compelling governmental interest is served by allowing the Association to take a position in favor of or against this tort legislation. *See Arrow v. Dow,* 544 F. Supp. 458, 463 (D.N.M. 1982). Further, he argues, even if the taking of a position on tort reform by the Association serves a compelling State interest, his first amendment rights are still violated because that interest could be served through less drastic means, such as the appearance of Association members before the legislature, either individually or as members of voluntary groups of attorneys, and not as representatives of the Association.

The constitutional claim that the petitioner raises is a serious one. *See Schneider v. Colegio de Abogados de Puerto Rico,* 546 F. Supp. 1251, 1261-62 (D.P.R. 1982). It involves the delicate balance between the free speech rights of an individual and those of an organization of which he is required to be a member. As such, he has only limited input into legislative positions taken by the Association. Nonetheless, whatever his level of influence within the organization, the most extreme form of protest, withdrawal, is not open to him. On the other hand, requiring silence on the part of the Association would pose serious prudential questions. The problem we face is how to accord proper weight to each substantial, and in this case conflicting, interest.

In *Lathrop,* the United States Supreme Court upheld the constitutionality of integrated State bar associations, but did not decide whether a dissenter from the positions espoused by such an association could constitutionally be compelled to finance those positions through the payment of dues. *Lathrop,* 367 U.S. at 847-48. In later cases concerning agency shop arrangements whereby an employee is required to contribute dues to the union representing him or her, but is not required to be a formal member of it, the Court held that employees could not constitutionally be forced to contribute dues to ideological activities unrelated to collective bargaining, *see, e.g., Abood,* 431 U.S. at 234-35. More recent federal cases have centered around the adequacy of procedural schemes designed to deal with this problem, *see, e.g., Ellis v. Railway Clerks,* 466 U.S. 435 (1984). However, the petitioner here argues strenuously that dues abatement of the sort suggested by the United States Supreme Court in various union shop cases, *see, e.g., Machinists v. Street,* 367 U.S. 740,

774–75 (1961), is an inadequate remedy because the Association would still be able to engage in the complained of legislative activity. The relief sought by the petitioner is therefore an order forbidding the Association to actively oppose tort reform.

■ We note that once the United States Supreme Court decided that the elimination of the free rider problem and the maintenance of labor peace were sufficiently important to justify the allowance of union or agency shop agreements, but that dissenters could not be compelled to support financially the promotion of ideological positions to which they were opposed, the only issue remaining was how to fashion an appropriate remedy. By contrast, we have a greater freedom and a greater responsibility in the case before us because of our authority to regulate the legal profession. In interpreting language in the Association's constitution describing its purposes, we can craft a standard which will at once recognize the negative first amendment rights of dissenting Association members and achieve consistency with the Association's core responsibilities. Thus, we base our decision in this case upon our inherent constitutional obligation to avoid infringement, and the serious risk of infringement, of first amendment liberties. Moreover, because we believe not only that the Association has exceeded its constitutional authority in its present opposition to tort reform, but that fairness to its Board requires that it be given more specific guidance in the area of what legislative activities before the General Court are permissible, we choose to take this opportunity to promulgate clearer guidelines in this area.

This court, in the exercise of its inherent constitutional power to regulate the practice of law, ordered the integration of the bar and retains continuing supervisory authority over the Association and its activities, *see In re Unification of the New Hampshire Bar*, 109 N.H. at 263–64, 248 A.2d at 711–12. In the exercise of that authority, the court is obligated to interpret the limits on bar activities so as to preclude the first amendment infringement that would result if the Association were to take positions on issues outside the scope of those responsibilities that justify compelling lawyers to belong to it. The line that we draw below is intended to divide issues that are within the scope of the Association's objectives, and on which official positions abridge no negative first amendment rights, from those that fall outside those objectives, such that official comment would risk first amendment infringements.

■■ Given these preliminary observations, we will endeavor to define more clearly than we have before the standard which should

govern the Association's activities before the General Court. In view of the Association's special status as a unified bar, we conclude that concerns for first amendment liberties require a narrower view of its permitted legislative activities than the Association has taken. Hence, the Association should limit its activities before the General Court to those matters which are related directly to the efficient administration of the judicial system; the composition and operation of the courts; and the education, ethics, competence, integrity and regulation, as a body, of the legal profession. The Board's opposition to tort revision as a whole is not within the mandate of the Association's constitution. In essence, to interpret the phrase "administration of justice" in the Association's constitution as broadly as the dissenters do would be to eliminate any limitation on the legislative activities of the Association, where one was clearly intended.

██ ██ We believe that circumspection is the watchword to be observed by the Board. Where it can reasonably be argued that an issue is outside the scope of its authority, the Board should take no position on the matter. Where substantial unanimity does not exist or is not known to exist within the bar as a whole, particularly with regard to issues affecting members' economic self-interest, the Board should exercise caution. Positions taken by the Association and its Board should be tailored carefully and limited to issues clearly within the Association's constitutional mandate. Of course, nothing prevents officers and members of the Board from appearing before the General Court to express their views as individuals, as members of voluntary associations or as representatives of clients.

Application of this standard to specific provisions of the "tort reform" package will help to clarify its scope. For example, the Board in its official capacity could properly support or oppose the following measures: creation of an enforcement mechanism for rights of contribution (SB 78); promulgation of standards for qualification of expert witnesses (HB 329-FN); creation of a periodic payment scheme for cases in which future damages are found to exceed $50,000 (HB 329-FN); and the allowance of double costs where the court finds that an action is clearly frivolous (HB 338). By contrast, the Board should take no position on the following matters: establishment of a substantive right of contribution (SB 78); allowance of limited contribution from employers (SB 78); creation of ceilings on municipal liability and damages for non-economic losses (SB 78); and establishment of standards for negligence actions against public entities and employees arising from so-called "pollutant incidents" (SB 78).

■■■■ Although petitioner requests that we issue an order enjoining the Association through its Board from exceeding its mandate in opposing tort reform, we do not find such relief either appropriate or necessary under the circumstances of this case. *See O'Neil v. Thomson,* 114 N.H. 155, 165, 316 A.2d 168, 173–74 (1974); *Tirrell v. Johnston,* 86 N.H. 530, 532, 171 A. 641, 642, *aff'd,* 293 U.S. 533 (1934).

*So ordered.*

JOHNSON, J., concurred; SOUTER, J., concurred specially; BATCHELDER, J., and KING, C.J., concurred in part and dissented in part.

SOUTER, J., concurring: I join in Justice Brock's opinion for the court, but I wish to explain why I disagree with Justice Batchelder's dissenting opinion. He concludes that in 1972 this court intended to authorize all of the lobbying in issue here when it approved article I of the Association's constitution, which permits the Association to engage in legislative activity on "matters . . . related directly to the administration of justice." He also concludes that none of the lobbying violates the first amendment rights of dissenting members, even though the legislative activities are financed in part by compulsory dues. I am unable to accept these conclusions.

To explain the disagreement, it is useful to emphasize some of the facts that give rise to the issue presented by this petition and to summarize the first amendment law that bears on its disposition. When this court ordered the unification of the Bar by requiring all practicing lawyers to maintain membership in the Association, it approved the following language in article I of the Association's constitution: "The Association shall confine its activities before the General Court to those matters which are related directly to the administration of justice; the composition and operation of the courts; the practice of law and the legal profession." *See In re Unified New Hampshire Bar,* 112 N.H. 204, 291 A.2d 600 (1972).

Subject to this authorization, and limitation, the Association takes official positions on legislative matters by vote of its Board of Governors, following a recommendation of the Association's Legislation Committee. Once the Association has taken such a position, its legislative activity may include lobbying, or urging legislators to vote in accordance with the official position, even though the Association candidly acknowledges to the legislature that its position does not necessarily reflect the views of all its members.

In its current fiscal year, the Association has appropriated $15,000, or 1.4% of its revenues, for the support of activity before the legislature, and has retained paid lobbyists to represent it. During the present session of the legislature, the Association has lobbied

against elements of several bills that have been described collectively as relating to tort reform or revision, the features of which are specifically described in the majority opinion.

The petitioner is a member of the Association. He claims that financing the Association's lobbying against the tort revision bills with a portion of the dues that he is compelled to pay violates article I of the Association's constitution, as well as his own first amendment rights, applicable here through the fourteenth amendment. Although the petitioner does not specifically identify the objectionable elements of the Association's official lobbying position, I believe it is reasonable to read the petition as indicating sufficient disagreement on subjects addressed by the lobbying efforts to warrant our review. *See Abood v. Detroit Board of Education*, 431 U.S. 209, 236 (1977); *cf. Lathrop v. Donohue*, 367 U.S. 820, 845 (1961) (without identifying points of disagreement, first amendment issue inadequately framed).

It is important, in any case, to identify the exact issue that the petitioner raises. The petitioner does not challenge the appearance of the Association's officers before legislative committees, provided that they do not purport to espouse official positions on behalf of the Association. He does not claim that it would be improper for the Association to provide informational or technical assistance to legislative committees or to provide facilities for use by special committees engaged in drafting legislation. Nor does he claim that the lobbying in question would violate his first amendment rights if it were not supported in part by his compulsory dues. When, therefore, the dissent observes that "lawyers are uniquely qualified to advise" the legislature about the subjects of the tort revision bills, it does not address the issue that the petitioner raises. The petitioner objects to the scope of the lobbying supported by his involuntary dues, not to neutral advice or to legislative activity unsupported by his mandatory contributions.

Although the petitioner thus places the legitimate scope of the Association's lobbying activities in issue, we cannot resolve that issue simply by looking to the language in article I of the Association's constitution to see what it permits. This is apparent from a reading of that portion of the article I language upon which the dissent relies, which confines legislative activities to "matters . . . related directly to the administration of justice, . . . ." While this language would be sufficiently clear to prohibit lobbying, say, on a proposal to restructure the legislature, it is not sufficiently definite to provide a clear answer when we have to decide whether the Asso-

ciation may lobby on a proposal to limit contingent fees, or to limit recoveries for pain and suffering, or to provide for contribution between joint tortfeasors. This is so because of the very general terms that article I employs in order to express its policy of limiting the scope of the Association's legislative activity. Although the generality is appropriate for an organic charter intended to set such a policy for a long future, the language does not provide many clear answers to detailed questions. The answers to such questions must follow, rather, from the principles that we employ to interpret the general policy statement. Consequently, the issue before us has to be phrased, not as a question about what the quoted language permits, but as questions about how that language ought to be interpreted and applied.

Chief among the principles that might inform our efforts to interpret and apply the article I language are those comprised by the first amendment, on which the petitioner relies. If the petitioner's first amendment claim is well taken, we must, at the least, follow first amendment standards when we decide how to interpret and apply the general language of article I. The majority opinion rests on the conclusion that the petitioner's claim is sound, when judged with reference to some elements of the tort reform bills, while the dissent finds no first amendment violation. The majority opinion accordingly relies upon first amendment standards in construing the article I language that limits lobbying, while the dissent perceives no first amendment policy calling for the application of such limits in this case. I conclude that the majority opinion is correct and the dissent is mistaken.

A lawyer's interest in freedom to choose or to reject membership in a bar association parallels an employee's interest in freedom to decide whether to belong to a labor union. *See Railway Employes' Dept. v. Hanson*, 351 U.S. 225, 238 (1956); *Abood v. Detroit Board of Education*, 431 U.S. at 217 n.10; *Machinists v. Street*, 367 U.S. 740, 749 (1961); *Romany v. Colegio de Abogados de P.R.*, 742 F.2d 32 (1st Cir. 1984); *Arrow v. Dow*, 544 F. Supp. 458 (D.N.M. 1982). Although the interest of each is subject to first amendment protection, an employee may be compelled by union shop or agency shop agreements to join a union, or to pay a union's service fee, in order to serve the counterbalancing public interest in effective collective bargaining and contract administration. *Railway Employes' Dept. v. Hanson supra.* A lawyer may likewise be compelled to join and pay dues to a unified bar association in order to render the association effective in fostering integrity and efficiency in the legal system that serves the public. *Lathrop v. Donohue*, 367 U.S. at 843; *In re*

*Unification of the New Hampshire Bar*, 109 N.H. 260, 263–64, 248 A.2d 709, 712 (1968).

The powers of the union under such closed or agency shop authority, and the powers of the unified bar association, are not unlimited, however. The justification for overriding personal first amendment interests extends only so far as the need to serve the counterbalancing public interests. *Abood v. Detroit Board of Education*, 431 U.S. at 234. Thus employees in an agency shop "may constitutionally prevent the Union's spending a part of their required service fees to contribute to political candidates and to express political views unrelated to its duties as exclusive bargaining representative." *Id.* When the compulsory organization uses dues or fees to finance political or ideological activities that are not reasonably related to the responsibilities that justify the compulsion to join, it infringes on the first amendment rights of members who dissent from the organization's positions. *Id.* On this reasoning, neither *Lathrop* nor our own decisions ordering unification can be read as investing a unified bar association with unlimited authority to use membership income in lobbying for any purpose that a majority of the membership believe to be appropriate. *See, e.g., Romany v. Colegio de Abogados de P.R. supra; Arrow v. Dow supra.*

To understand the specific limitations on a unified bar association's authority to use a dissenting member's income to finance its legislative activity, we must look to *Lathrop*, which contains the United States Supreme Court's definitive discussion, thus far, of the responsibilities and objectives that justify compulsory bar association membership. As against the first amendment challenge, the Court found that

> "[b]oth in purport and in practice the bulk of State Bar activities serve the function, or at least so [the State] might reasonably believe, of elevating the educational and ethical standards of the Bar to the end of improving the quality of legal service available to the people of the State, without any reference to the political process. It cannot be denied that this is a legitimate end of state policy." *Lathrop*, 367 U.S. at 843 (footnote omitted).

It is clear, then, that "without reference to the political process" *Lathrop* holds that the justifying objectives include promotion of competence and integrity within the bar, as the means to improve the quality of legal services available to the public.

Although the holding of *Lathrop* is thus limited, it would be a mistake to deny that the case has any further significance. To be sure, the Court reserved judgment on the legitimate scope of a uni-

fied bar association's lobbying at a dissenting member's expense, *Lathrop v. Donohue*, 367 U.S. at 844. But there is something to be learned from the Court's description of the lobbying that had been carried on by the association involved in that case. The Court noted that the association had lobbied before the State legislature on a variety of bills affecting judicial quality, court organization and jurisdiction, and technical matters ranging from requirements for recording conveyances to the recognition of dower and curtesy. *Id.* at 837. If the plurality of the Court had considered that using compulsory dues to finance lobbying on such subjects would violate an occasional dissenter's first amendment rights, it is difficult to believe that the Court would not have so held, for the appellant clearly sought such a broad holding. I infer from this that at least some of the described lobbying was thought to promote objectives that justify unification. It is probable, then, that such objectives include improvement in the quality of the bench as well as of the bar, and the development of processes and procedures by which citizens have access to the legal system to enforce substantive law and the objects of private transactions.

I would therefore summarize the significance of *Lathrop* this way. The objectives justifying a unified bar association include the encouragement of competence and integrity among lawyers and judges; the provision of public access to the legal and judicial systems; and the development of efficient mechanisms to secure and enforce legally recognized rights and the intentions of transacting parties.

Under *Abood*, a unified bar association may use the dues of a dissenting member to finance lobbying on a legislative proposal reasonably related to the promotion of any such objective. The conclusion must be otherwise, however, when the proposal would affect the substantive content of legal rights and obligations, as distinguished from the process and procedure by which such rights and obligations are enforced. It is in this light that we must assess the present petitioner's first amendment claims.

I believe that the petitioner is correct in claiming a first amendment violation, as will be seen from the analysis of one example from among the many proposals included in the tort revision bills, the proposal to limit monetary damages for pain and suffering to $250,000. Senate bill 78. If enacted, this proposal would in some cases affect verdicts, insurance companies' pay-outs, and the amount of plaintiffs' lawyers' fees. Its consequences would be economic, and they would fall unequally on both clients and lawyers. The proposal raises basic substantive issues of social policy, about the proper

scope of compensable injury and about the proper use of legislative power to apportion risk and limit liability for harm.

Despite the social significance of the proposal, there is no reason to believe that its enactment would have any effect on the integrity or competence of the bar or bench. Nor is there any obvious reason to believe that it would affect access to the courts, by limiting the willingness of lawyers to take personal injury cases. Nor, finally, would it modify the mechanisms employed to secure legally recognized rights.

It would, however, affect the very substance of the right to recover for injury, by providing as a matter of law that one particular element of injury could not be valued more highly than $250,000. Consequently, when the Association appears before the legislature to express an official position on the merits of that proposal, it is not acting to discharge those responsibilities that justify the limitation of an Association member's first amendment interests, and a dissenting member may not be compelled to contribute money to finance such lobbying.

The majority opinion, of course, lists other elements of the tort revision bills that may ground first amendment claims on the facts presented to us. This one example, however, is enough to demonstrate that the petitioner's first amendment claim has merit and that first amendment standards must be applied when interpreting article I of the Association's constitution.

Against this analysis, the dissent offers three responses. First, the dissent implies as a threshold matter that there is no need to resort to any interpretive principles in order to decide whether relating "directly to the administration of justice" should be read broadly enough to permit lobbying on the features of the tort revision bills. The dissent suggests that if the bills are passed, the administration of justice will have been altered significantly, simply because the subject of tort revision is the law and the law will have been changed.

This reasoning suffers on two counts, however. First, it fails to appreciate the conceptual generality of the portion of the Association's constitution that is in issue here; it simply passes over the question whether the quoted language should be read so broadly. Second, even on its own terms, this reasoning ignores the distinction between the administration of justice and the content of the law that is administered, a distinction implicit in *Lathrop*, and one which the language in question was patently intended to observe. If, indeed, any change in the substantive law were *ipso facto* related "directly to the administration of justice," then there would have been no reason to include the quoted language in article I, because the Associa-

tion could lobby on virtually any substantive matter that might be subject to litigation. In reality, this expansive view would read the quoted limitation right out of article I, and the first amendment violations that would inevitably result would be redressed in other forums. *See, e.g., Arrow v. Dow*, 544 F. Supp. 458.

The dissent's second and third responses to the majority analysis take the different tack of arguing that the first amendment is of no interpretive significance here, because there is no first amendment violation on the facts of this case. The first argument against finding a first amendment infringement rests on a balancing analysis, for which the dissent believes there is authority in *Abood*, and in *Ellis v. Broth. of Ry., Airline and S.S. Clerks*, 104 S. Ct. 1883 (1984). The dissent asserts that the petitioner has identified no "significant infringement" on his first amendment rights, to be weighed against the State interest in "obtaining the composite judgment of the bar" on the pending bills, and concludes that there is consequently no first amendment violation in using the petitioner's dues to lobby, over his objection.

This argument, I submit, rests on a mistaken view of the place of a balancing analysis in this first amendment context. *Hanson* and *Lathrop* each applied a balancing analysis when they held that the promotion of certain objectives by a compulsory organization justifies the limitation of its member's freedom of association. In each case the balancing analysis identified those objectives and, as it were, determined their importance when weighed against the competing first amendment interests. However, once those objectives are identified, and held to justify compelled association, there is no further balancing to be done. Thereafter, the only issue that may arise is whether a given activity of the association, financed by compulsory dues, falls within the scope of the objectives previously identified. *Abood v. Detroit Board of Education*, 431 U.S. at 234.

Thus, for purposes of the present case, *Lathrop* identified the objectives that justify compulsory membership. The issue before us, then, is whether lobbying on given proposals for tort law revision is reasonably related to the accomplishment of any of those objectives. Resolution of this issue does not call for balancing; it calls for comparing the objectives of the lobbying with the objectives justifying compulsory membership.

The dissent's final response arguing against finding a first amendment infringement rests on a quotation from Justice Harlan's concurring opinion in *Lathrop*, in which he stated that dissenting members of an involuntary association are merely required to contribute funds to a group expenditure over which they will have

something to say. Whatever may be the merits of that view when read in its context, it does not support the dissent in this case.

As noted above, the appellant in *Lathrop* did not identify the particular lobbying to which he objected, and the Court was not faced with a question as concrete as the one before us in the present case. The lack of a concrete issue led the plurality in *Lathrop* to decline to rule on the question now before us, which had to await *Abood*. Justice Harlan did attempt to consider it, but the most that he could say, without an explicit question before him, was summed up in the statement that he did "not understand why it should become unconstitutional for the State Bar to use appellants' dues to fulfill some of the very purposes for which it was established." *Lathrop v. Donohue*, 367 U.S. at 850 (Harlan, J., concurring); *see id.* at 864. It is thus clear that Justice Harlan was not addressing the issue raised in this case, whether it is unconstitutional for the Association to use the dissenter's mandatory dues for an ideological purpose that is not reasonably related to justifications for requiring membership.

Since I am not persuaded by the dissent, I am left to conclude that use of the petitioner's dues for certain of the lobbying identified in the majority opinion violates his first amendment rights. The only real question is how to avoid the violation. There are three possibilities. One would be to eliminate all lobbying, *see Falk v. State Bar of Michigan*, 411 Mich. 63, 116, 305 N.W.2d 201, 217 (1981) (Ryan, J., concurring). But such a draconian approach would ignore the real public service that the Association provides when it lobbies on issues that are germane to its responsibilities as a unified bar association.

The second possibility would be to require the Association to provide a mechanism for a reduction in dues reflecting the extent to which the lobbying is not germane or reasonably related to those responsibilities approved in *Lathrop*. *See Chicago Teachers Union, Local No. 1 v. Hudson*, 106 S. Ct. 1066 (1986). Since, however, the majority opinion makes it clear that some lobbying, even on the tort revision issues, raises no constitutional problem, calculating a proper reduction of dues would be extremely complicated. Dues reduction, moreover, is never a wholly satisfactory remedy in such cases. For after the dues are reduced by some trifling amount, a dissenter is still compelled to belong to an association officially advocating views with which he disagrees, on a subject outside the scope of those responsibilities that are accepted as justifying his mandatory membership.

The remaining possibility is to recognize limits on the scope of the Association's lobbying, so that dues reductions or other unsatisfactory alternatives will not be necessary to avoid infringements on

first amendment rights. This possibility brings us back to the issues of interpretation and application of interpretive principles, which I believe are the proper focus of the case. The court must interpret the language of the Association's constitution in such a way as to obviate first amendment violations. When article I limits lobbying to matters "directly" related to "the administration of justice; the composition and operation of the courts; the practice of law and the legal profession," it must be understood to confine lobbying activity to proposals affecting those subjects recognized in *Lathrop*: competence, integrity, effective access to the legal system and efficient vindication of substantive rights and transactional objectives. The language cannot be read, conversely, simply to authorize lobbying on any issue of substantive law, however strongly a majority of the Association may feel about it. This, I submit, is the position upon which the majority opinion properly relies.

This opportunity to interpret the language in question in a way that will avoid first amendment infringements is one that the federal courts, to be sure, have not always enjoyed when deciding how to reconcile first amendment rights with union or agency shop membership requirements. Although the Supreme Court will engage in just this sort of interpretation when it can, *see Ellis v. Broth. of Ry., Airline and S.S. Clerks*, 104 S. Ct. 1883; *Machinists v. Street*, 367 U.S. 740, in the absence of such an opportunity, the federal courts have been faced with a choice between dues reductions and injunctions against political or ideological activities. Given the policy of the Norris-Laguardia Act, 29 U.S.C. 101 *et seq.*, the United States Supreme Court has viewed injunctive relief as a last resort, and it has been concerned that injunctions against a union's political or ideological activities would affect the first amendment rights of those union members who desire to associate for political purposes, as well as for collective bargaining. *See Machinists v. Street, supra* at 771–72; *Railway Employes' Dept. v. Hanson*, 351 U.S. 225; *Abood v. Detroit Board of Education*, 431 U.S. 209. These concerns explain why the compromise of a dues reduction has been the favored remedy in union shop cases.

This court, however, is not constrained by such concerns. On the one hand, we are not dealing with congressional labor policy; we are dealing with general language in the Bar Association's charter, which we are obligated to approve and interpret. On the other hand, it is clear that New Hampshire lawyers who wish to oppose the tort revision proposals will not be thwarted by an interpretation of the Association's authority that obviates first amendment issues. There is, besides the Association, at least one voluntary organization of lawyers that would lend itself to the purposes of such opposition, and

there are genuine opportunities for effective organization devoted to the particular legislation in issue.

Since the court does have the obligation and opportunity to interpret the Association's constitution so as to avoid the need for dues reductions or other remedial action, two aspects of the majority approach are worth noting. First, the majority opinion is certainly correct in recognizing that our interpretive reliance on *Lathrop* will not provide a clear answer for every case. The requisite interpretation will, as in the case before us, necessarily give way to detailed choices in deciding what is and is not permissible in disputed cases. *See Abood v. Detroit Board of Education, supra* at 236. Because the proper place to draw the line will often be unclear, we do not claim that the choices that we make in the majority opinion are immune from responsible disagreement. *Compare Ellis v. Broth. of Ry., Airline and S.S. Clerks,* 104 S. Ct. 1883, with *Ellis v. Broth. of Ry., Airline & S.S. Clerks,* 685 F.2d 1065 (9th Cir. 1982). But the majority opinion is likewise correct in observing that the reasonable interests of the Association, no less than the constitutional interests of its dissenting members, justify the effort.

Second, the interpretative process that we engage in today does not, as the dissent charges, signify an "abrupt departure" from the court's position at the time of unification in 1972. That position may well have been reflected in the court's tacit approval of a "Report of the Board of Governors" on the Association's lobbying at the 1971 legislative session, a report which was before the court when it approved unification in 1972, and to which the dissent refers today. The report indicates that the Association had taken positions on bills affecting dower and curtesy, the right to jury trial in an eminent domain proceeding, the right to a jury trial in a district court, consequences of frivolous appeals to this court, the use of memorandum opinions, and arbitration of small claims. If one compares these subjects against the objectives recognized in *Lathrop*, it appears that all of the bills, with one arguable exception, would be permissible subjects of lobbying under today's decision. There is no abrupt departure. Moreover, between 1972 and the filing of this petition, there were no challenges to the Association's lobbying practices, and the court has had no occasion to interpret the Association's authority in any way.

We must, indeed, recognize that the necessity for such interpretation has been inherent in the general language of the Association's constitution from the moment this court approved unification. In 1972, the court took care to point out this very fact, when it expressly left the present issue open and unresolved. *In re Unified New Hampshire Bar,* 112 N.H. 204, 207, 291 A.2d 600, 601–02

(1972). The court at that time characterized the issue as worthy of consideration, and suggested that the Association might itself refine the limitations on its lobbying authority by adopting guidelines. *Id.* In the meantime, *Abood v. Detroit Board of Education,* 431 U.S. 209, has been decided. Since *Abood,* the process of interpretation that the majority adopts today has been one of a very limited number of possible responses to this court's obligation to apply the Bill of Rights as the Supreme Court of the United States has shaped it.

BATCHELDER, J., with whom KING, C.J., joins, concurring in part and dissenting in part: I would deny the petition. In my view each of the components of the tort reform package relates "directly to the administration of justice," N.H.B.A. CONST. art. I, and hence is within the scope of permissible Association activity before the General Court. For better or worse, if the General Court enacts these proposals, the administration of justice in New Hampshire will have been significantly altered. The subject of the tort reform package is law itself, and lawyers are uniquely qualified to advise the legislature about it.

The court's opinion curtails the scope of the Association's legislative activities to an extent never contemplated by the founders of our integrated bar. When Justice Duncan wrote this court's decision ordering permanent unification, the court envisioned a vigorous program of legislative activity by the Association. Suggested guidelines regarding such activity were made a part of the record in the unification proceedings. Upton, Suggested Policies and Guidelines for Legislative Activities, *In re Unified New Hampshire Bar,* 112 N.H. 204, 291 A.2d 600 (1972). At the time the bar was unified, the Association frequently advised the General Court on a wide range of proposed legislation. During the 1971 legislative session it took a position on a bill to abolish dower and curtesy. Report of the Board of Governors app. A at 2, *In re Unified New Hampshire Bar supra.* In 1972, the year of permanent unification, the Association presented to a House committee its views on a no-fault automobile insurance proposal. *Lawyers Oppose Durkins No-Fault Proposal,* Manchester Union Leader, May 4, 1972, at 3, col. 1. The following year the Association took positions on proposed legislation (1) permitting warrantless misdemeanor arrests following certain traffic accidents; (2) extending liability to motor vehicle owners for acts of drivers passing stopped school buses; (3) granting citizens standing to sue in environmental protection actions; and (4) codifying the Uniform Partnership Act. *See* N.H.B. NEWS, March 1973, at 2; *id.,* April 1973, at 1; *id.,* May 1973, at 1.

In sum, neither the bar nor the court has ever regarded legislative

activity on matters comparable to the "tort reform" issue as incompatible with the Association's constitution or the integrated bar concept. *See Lathrop v. Donohue,* 367 U.S. 820, 843 (1961) (State may constitutionally require membership in bar association even though association engages in legislative activity). Nothing in the present petition justifies today's abrupt departure from this approach.

I also would hold that the Association has not violated the petitioner's rights under the State or Federal Constitution. The petitioner contends that in *Lathrop* the Supreme Court held that only the elevation of "the educational and ethical standards of the Bar" is a "legitimate end" of bar association activity. *Lathrop,* 367 U.S. at 843. Because the Association's legislative efforts in the present case do not relate to this end, he reasons, they are proscribed by the first amendment.

The petitioner's reliance on *Lathrop* is misplaced, however. The source of his interpretation of that case is an inference drawn from two sentences contained in a plurality opinion that expressly fails to reach the constitutional issue with which we are presented. *Lathrop's* only unequivocal holding is that a State may compel a lawyer to pay dues to a bar association engaging in legislative activity without impinging upon protected rights of association. *Lathrop* does not contain a definitive pronouncement as to which bar association activities are, and which are not, legitimate ends of State policy for purposes of freedom of speech analysis.

I read *Abood v. Detroit Board of Education,* 431 U.S. 209 (1977), and *Ellis v. Railway Clerks,* 466 U.S. 435 (1984), as mandating a balancing test in negative first amendment cases such as this. "The more serious the infringement of individual interests, the more vital the asserted advancement of government interests must be to outweigh the infringement and vice versa." Gaebler, *First Amendment Protection Against Government Compelled Expression and Association,* 23 B.C.L. REV. 995, 1016 (1982). The petitioner has neither identified the specific nature of his disagreement with the Association's presentation to the legislature, *see Lathrop,* 367 U.S. at 845–46, nor demonstrated a significant impingement upon his right freely to express his own views. *See id.* at 848–61 (Harlan, J., concurring); *Falk v. State Bar of Michigan,* 418 Mich. 270, 292–99, 342 N.W.2d 504, 511–14 (1983) (Boyle, J., concurring), *cert. denied,* 105 S. Ct. 315 (1984). *See generally* Cantor, *Forced Payments to Service Institutions and Constitutional Interests in Ideological Non-Association,* 36 RUTGERS L. REV. 3 (1983). "The dissenter is not being made to contribute to the furtherance of views he opposes but is rather being made to contribute funds to a group expenditure

about which he will have something to say." *Lathrop*, 367 U.S. at 856 (Harlan, J., concurring).

On the other hand, there is a significant State interest in obtaining the composite judgment of the members of the bar on legislative proposals directly affecting the administration of justice and the practice of law. *Lathrop*, 367 U.S. at 863 (Harlan, J., concurring); *Gibson v. Florida Bar*, 1 ABA LAW. MAN. PROF. CONDUCT (BNA) 954, 955 (N.D. Fla. Aug. 12, 1985). In serving as an advisor to the General Court, the Association furthers a vital public interest and fulfills one of its essential functions. Improving the administration of justice has been a *raison d'etre* of the Association since its inception. *See, e.g.*, Laws 1873, 115:1 (bar association incorporated "for the purpose of . . . increasing its usefulness in promoting the due administration of justice"); 1 PROCEEDINGS OF THE BAR ASSOCIATION OF THE STATE OF NEW HAMPSHIRE 705–18 (1900–03) (1902 report of committee to recommend amendments to the statute law); Upton, *Centennial History of the New Hampshire Bar Association*, 15 N.H.B.J. 35, 88 (1973) (Association's role in enactment of Uniform Commercial Code in New Hampshire). We recognized the importance of this role of the Association when the bar was unified nearly twenty years ago. *In re Unification of the New Hampshire Bar*, 109 N.H. 260, 265–66, 248 A.2d 709, 713 (1968).

Many legislative proposals affecting the administration of justice, including those at issue here, include both substantive and procedural aspects. Today's decision deprives New Hampshire lawyers of an important opportunity to express their collective judgment about these proposals, and the General Court of the potential benefit of this judgment. Neither the architects of our unified bar, nor the court that sanctioned it, intended this result. Nothing in the first amendment compels it. I concur in the holding of the court to the extent that it permits the Association to address some elements of the tort reform package before the General Court. I dissent from the holding to the extent that it prohibits the Association from addressing the remaining elements of the package.