Original
No. R-97-001

IN RE THE PROPOSED PUBLIC PROTECTION FUND RULE

(Petition of the New Hampshire Bar Association)

January 22, 1998

*Michael P. Hall* and *Thomas Quarles, Jr.*, orally, in favor of the adoption of the proposed Public Protection Fund Rule.

*Mark P. Hodgdon* and *H. Bernard Waugh, Jr.*, orally, opposed to the adoption of the proposed Public Protection Fund Rule.

BROCK, C.J. The New Hampshire Bar Association has requested that this court establish a Client Protection Fund to reimburse clients for losses caused by the infrequent dishonest conduct of New Hampshire lawyers. We referred the matter to our advisory committee on rules, *see* SUP. CT. R. 51, which amended the Bar

Association's proposal, including recasting the name of the fund to the Public Protection Fund (PPF). The advisory committee on rules recommended that this court adopt a rule establishing a PPF. In evaluating the Bar Association's proposal and the advisory committee's recommendation, the court solicited and received comments from the bench, bar, legislature, executive branch, and the public, *see Appendix One, infra,* and held oral argument. We now adopt, with further amendments, the proposed Public Protection Fund Rule, to be known as Supreme Court Rule 55, as set forth in *Appendix Two* to this opinion.

The PPF is not a novel concept. As early as 1961, the Bar Association created a client indemnity fund to reimburse clients who suffered losses at the hands of a legal counsel. Between 1961 and 1985, revenue for the fund was generated by either mandatory assessments on all bar members or allocations from bar dues. During this period, the fund paid thirty-eight claims totaling $74,712. By 1985, the fund had accumulated a reserve of approximately $123,000. As a consequence of a favorable claims history, a sizeable reserve, and income earned on the reserve, the Bar Association ceased annual contributions to the fund in 1985. Unfortunately, by 1992, as a result of the dishonesty of Attorney John Fairbanks and a few others, the client indemnity fund was in default. Although a large number of voluntary contributions were made to the fund by Bar Association members, the revenues raised were insufficient to provide meaningful protection to affected clients.

In 1996, against this factual backdrop, the legislature established a study committee to examine bonding and other alternatives to protect client trust funds held by lawyers. Laws 1996, ch. 117. In response, we indicated to the study committee that we would consider mandatory bonding for lawyers in accordance with our rulemaking process. Soon thereafter, the committee recommended that we adopt rules to require bonding. *See* FINAL REPORT OF THE COMMITTEE TO STUDY BONDING OR OTHER ALTERNATIVES TO PROTECT CLIENT TRUST FUNDS HELD BY ATTORNEYS (SB 513, CHAPTER 117, LAWS OF 1996) (November 1, 1996). This proceeding and the adoption of Supreme Court Rule 55 arise directly from our commitment to the legislature to carefully consider the need to impose bonding requirements by court rule. It is appropriate for this court to take the initiative.

■ "The task of *supervising* and disciplining attorneys within this State falls squarely upon the shoulders of this court." *Petition of Burling,* 139 N.H. 266, 268, 651 A.2d 940, 941 (1994) (emphasis

added; quotation and brackets omitted). "In exercising the power to discipline members of the bar, we have the obligation both to protect the public and to promote confidence in and respect for the bar." *Id.* at 272, 651 A.2d at 944. Our obligation to protect the public is no less important when we supervise attorneys in this State than when we discipline them. In fact, in our past exercise of our supervisory authority, we have been cognizant of our duty to protect the public and to promote confidence in and respect for the bar. Our establishment of rules on trust accounts (Supreme Court Rule 50), trust account certification (Supreme Court Rule 50-A), continuing legal education (Supreme Court Rule 53), and continuing judicial education (Supreme Court Rule 45) have helped fulfill those obligations. Adoption of the Public Protection Fund Rule is a further and important step in our continuing efforts to protect the public.

In taking this step today, we are mindful of the distinguished and honorable history of the New Hampshire Bar Association and are appreciative of the considerable service and accomplishments of its membership. The overwhelming majority of New Hampshire lawyers have continually served the needs and interests of their clients and communities with competence, adherence to ethical principles, and respect for the rule of law. The creation of the PPF is made necessary by the unscrupulous conduct of a few and not from any concern for the conduct of the many. It is consistent with the high ethical and professional standards espoused by the Bar Association during its remarkable history.

Opponents of the PPF contend that a mandatory fund will not discourage unethical behavior by lawyers and will, in effect, force honest lawyers to subsidize the acts of the few less-principled members of the bar. They also contend that the PPF will not satisfy all claims which may be filed. Finally, opponents argue that lawyers should not be singled out to pay into a fund based on their chosen profession, when other occupations are not similarly bound. We do not find these arguments persuasive.

We anticipate that the personal stake lawyers have in the fund, due to their personal contributions, will create a more watchful bar. Further, although the fund may not cover all claims that arise, it will ensure that a significant number of victims receive at least some restitution without unduly burdening bar members. Mandatory contributions will guarantee substantial revenue for the fund, which will compound during years of little demand while providing reserves in years of significant liability. Of course, other avenues of compensation will remain available to victims, including civil and criminal litigation. The PPF is designed as a last resort.

Victims of lawyer defalcation who suffer harm arising from fiduciary or client-lawyer relationships deserve the opportunity to seek restitution when other equitable and legal remedies are foreclosed. Although it rarely occurs in New Hampshire, lawyer defalcation is an inexcusable crime. Recently, the legal profession has received considerable criticism, much of it unfair, following the actions of a few corrupt members of the bar. Dispelling these misconceptions and rejuvenating public confidence is in the interest of all lawyers. This important task will be made easier by the creation of the PPF.

Integrity is essential to the practice of law. Lawyers are members of a unique profession, privileged to serve the public responsibly and credibly. We addressed these principles in *Astles' Case*, 134 N.H. 602, 606, 594 A.2d 167, 170 (1991), when we stated:

> In today's society, more than ever before, the legal profession touches and affects nearly every facet of private and public life. Without debating the merits of this pervasiveness, one indisputable consequence of such an increase has occurred: the need for maintaining and requiring the highest possible levels of honesty and trustworthiness from the legal practitioners in this State.

Any violation of that honesty and trust wounds the profession as a whole. The bar itself recognized the importance of trust to the profession by acknowledging in its constitution the need for "high standards of conduct, integrity, competence and public service on the part of those engaged in the practice of law." *In re Unification of the New Hampshire Bar*, 109 N.H. 260, 263-64, 248 A.2d 709, 712 (1968) (referring to Article I of the constitution of the New Hampshire Bar Association). Lawyers have a responsibility to maintain public trust and uphold public service with integrity. The comments to the ABA Model Code, which are included in the New Hampshire Rules of Professional Conduct, articulate this duty and state that when a "client security fund" has been established, a lawyer should participate. N.H. R. PROF. CONDUCT 1.15 comment.

Ensuring public trust is the responsibility of the profession as a whole and is certainly in its best interest. The Supreme Court of Delaware in *In re Member of Bar*, 257 A.2d 382, 383 (Del. 1969), in upholding that State's Clients' Security Trust Fund, ably articulated the need for collective responsibility:

> In a sense, therefore, the profession holds out to the public all its members in good standing as being competent, honest

and devoted to their clients' interests. This, it seems to us, is in the nature of a collective representation by the Bar to the public, and justifies a collective acceptance of responsibility when one of its members is false to his oath and the common precepts of honesty.

■ Some argue that judges, prosecutors, public defenders, those engaged in public practice, and those not engaged in active practice should escape the reach of the PPF. Although such argument is not fanciful, it is not persuasive. All those identified are members of the bar, share the privilege membership provides, and are subject to the duties and collective responsibilities of the profession. While distinctions can be drawn among the varied membership of the organized bar, they are decidedly outweighed by the common obligation to ensure the profession's continued integrity and public confidence. We note that Maine recently adopted a rule setting up a fund similar to the PPF that we adopt today, and that the rule promulgated by the Maine Supreme Judicial Court requires contributions from all bar members, including judges and inactive bar members. MAINE RULES FOR LAWYERS' FUND FOR CLIENT PROTECTION, Rule 3(a) (effective July 1, 1997). Because of this collective responsibility, all members of the bar who pay dues, no matter their category, will be called upon to contribute to the PPF. The contributions will be roughly pro-rated, based on dues paid, such that the contributions will range from five dollars annually for inactive retired members to fifty dollars for active practitioners who have been members of the Bar Association for more than five years.

■ Opponents also contend that the Bar Association's advocacy before this court for the PPF exceeds the limits placed on it by our opinion in *Petition of Chapman*, 128 N.H. 24, 509 A.2d 753 (1986). They argue that the PPF goes beyond the guidelines we set out regarding bar activities in *Chapman*. *See id.* at 32, 509 A.2d at 759. In that case, we stated that the association should limit its activities before the General Court to, among other things, matters directly relating to the education, ethics, competence, integrity, and regulation of the legal profession as a body. *See id.* The PPF clearly and directly concerns the integrity of the profession. Our analysis of *Chapman*, therefore, supports the right of the Bar Association to advocate before this court for the establishment of the fund we create today.

■■ Finally, the PPF is opposed as an unconstitutional tax and a violation of equal protection under the State Constitution in that

lawyers are not treated in the same manner as other professions. With regard to the former argument, we agree with the Supreme Court of North Carolina, which, in facing a challenge from a member of the bar to its fund, held:

> In ordering the assessment from attorneys for the support of the Client Security Fund, the Court was not imposing a tax, which is a legislative function. Rather, it was an act, found necessary by the Court, in aid of its own responsibility to see to the proper administration of justice.

*Beard v. North Carolina State Bar*, 357 S.E.2d 694, 696 (N.C. 1987). Regarding equal protection, we held in *Petition of Grimm*, 138 N.H. 42, 51, 635 A.2d 456, 462 (1993), that the State may "treat professions differently according to the needs of the public in relation to each." We have found a need to protect the public from the few members of the legal profession who might engage in criminal conduct. That need provides a sufficient rational basis for the disparate treatment of attorneys.

██ The PPF that we establish goes beyond protecting lawyer trust accounts which were the apparent concern of the legislative study committee. The fund will protect victims "for proven losses resulting from embezzlement, conversion, or theft of client funds by lawyers." SUP. CT. R. 55(2). The client funds, therefore, need not have been in a lawyer's trust account. Claims against the fund must be submitted within three years of the discovery of the defalcation but not later than one year after the offending lawyer has been disbarred or suspended from practice, a prerequisite for recovery from the fund. SUP. CT. R. 55(3). The maximum reimbursement with respect to the conduct of any one lawyer is $150,000, with an annual cap of all claims on the fund of $1,000,000. SUP. CT. R. 55(4). No payments are to be made from the fund with respect to a defalcation by an individual lawyer until all other remedies are exhausted and until all claims have been finalized with respect to the offending lawyer. *Id.*

We realize that the limits on this fund will mean that full recovery by all victims in all circumstances may not occur. No economically viable means exist to provide that protection. The PPF, however, does provide a reliable mechanism for the bar to meet its collective responsibility to the public. In fact, based on historical data, the victims of most lawyer defalcations will likely be paid in full. Only the victims of the most egregious defalcations will likely be left exposed. In an effort to provide greater public protection and to

enhance the integrity of the legal profession, we order the creation of the PPF and retain jurisdiction over matters regarding the fund as provided in Supreme Court Rule 55.

*So ordered.*

All concurred.

### *Appendix One*

We thank the following organizations and individuals for filing comments with the supreme court regarding the proposed Public Protection Fund Rule:

Curbstone Financial Management Corporation (Mr. Melvin J. Severance, III, CFP); New Hampshire Bar Association (Michael P. Hall, President; Patrick T. Hayes, President-Elect; Randall F. Cooper, Vice-President; and Bruce W. Felmly, Immediate Past President); G. Wells Anderson, Esq.; Wynn E. Arnold, Esq.; V. Hummel Berghaus, IV, Esq.; John F. Bomster, Esq.; Michael K. Brown, Esq.; Kevin G. Collimore, Esq.; Arthur M. Connelly, Esq.; Gyda M. DiCosola, Esq.; Anne M. Edwards, Esq.; Louie C. Elliot, Jr., Esq.; Jonathan M. Flagg, Esq.; Robert H. Fryer, Esq.; Joshua L. Gordon, Esq.; Representative Nick Hart; Mark P. Hodgdon, Esq.; Franklin C. Jones, Esq.; Warren R. Lindsey, Esq.; Jayne F. Lynch; Ignatius MacLellan, Esq.; Lee W. Mattson, Esq.; Richard E. Nusbaum, Esq.; Thomas Quarles, Jr., Esq.; Justin Richardson, Esq.; Gretchen C. Rule, Esq.; Kevin M. St. Onge, Esq.; Tony F. Soltani, Esq.; John E. Tobin, Jr., Esq.; H. Bernard Waugh, Jr., Esq.; Cynthia L. White, Esq.; Finis E. Williams, III, Esq.; and Mark S. Zuckerman, Esq.

### *Appendix Two*

### RULE 55. PUBLIC PROTECTION FUND

(1). *PURPOSE.* The purposes of the Public Protection Fund are to provide a public service and to promote public confidence in the administration of justice and the integrity of the legal profession by providing some measure of reimbursement to victims who have lost money or property caused by the defalcation of lawyers admitted to practice law in this jurisdiction occurring in New Hampshire and in the course of the client-lawyer or fiduciary relationship between the lawyer and the claimant.

(2). *ESTABLISHMENT OF THE FUND.* The New Hampshire Bar Association shall provide a Public Protec-

tion Fund establishing a reimbursement mechanism for proven losses resulting from embezzlement, conversion, or theft of client funds by lawyers, and for this purpose, the court shall annually assess a sum to be paid by all dues-paying members of the New Hampshire Bar Association. The Public Protection Fund shall be administered by the New Hampshire Bar Association. Subject to the review and approval of the court, the committee established pursuant to paragraph (5) shall determine the terms, conditions, claims procedures, scope of coverage, cost, and funding mechanisms for such Public Protection Fund, consistent with this rule. The Public Protection Fund is provided as a public service to persons utilizing legal services; the establishment, administration and operation of the Public Protection Fund shall not impose or create any obligation on, expectation of recovery from, or liability of the New Hampshire Bar Association, its officers, governors, members, staff, or members of the Public Protection Fund committee. No claimant shall have a legal interest in the fund nor have a right to receive any portion except as awarded pursuant to this rule.

(3). *CLAIMS AGAINST THE FUND.* Claims for payment from the fund shall be submitted in writing, under oath, and shall explain specifically the defalcations which led to the losses in question. Such claims must be submitted within three years of the time when the victim discovered or first reasonably should have discovered the defalcations and the resulting losses, but in no event later than one year after the lawyer in question has been suspended or disbarred from practice, or has died or been judged mentally incompetent before the suspension or disbarment proceedings have been commenced or concluded.

(4). *PAYMENTS FROM THE FUND.* Payments from the fund will be made only after the lawyer in question has been suspended or disbarred from practice; or if the lawyer has died or been judged mentally incompetent before the suspension or disbarment proceedings have been commenced or concluded. As a condition of payment from the fund, the claimant shall execute a subrogation agreement in favor of the fund against the offending lawyer and the offending lawyer's law firm and against third parties to the extent of the amount recovered by claimant from the fund.

Payments from the fund shall be made only after exhaustion of all available assets, insurance, and sureties of the offending lawyer and the offending lawyer's law firm. Payments from the fund shall be made only to victims who have lost money or property as the result of the defalcation of the lawyer, and no payments shall be made to any assignee, subrogee, or successor of such victim. The heirs or legatees of deceased victims may be eligible for payment from the fund. Payments from the fund shall be made only at the end of each fund year. Payments from the fund with respect to an individual lawyer shall not be made until all claims have been finalized with respect to that lawyer. The maximum amount of reimbursement to all claimants against the fund in respect to all conduct of any one lawyer shall be $150,000 in the aggregate. The maximum amount of reimbursement to any one claimant, or all claimants, against the fund in any fund year as defined in paragraph (6) shall be $150,000 and $1,000,000, respectively, in the aggregate. The maximum amount which may be paid on a claim shall be the dollar value of the money or property lost by lawyer defalcation and shall not include interest on the amount lost or money spent attempting to collect the loss. If payable claims against a lawyer exceed $150,000, then all payable claims against that lawyer shall be reduced in proportion to their relative value in order to reduce total payments as a result of that lawyer's conduct to $150,000. If payable claims in a single fund year exceed $1,000,000, then all payable claims for that fund year shall be reduced in proportion to their relative value in order to reduce total payments for that year to $1,000,000.

(5). *ADMINISTRATION OF THE FUND.* The Public Protection Fund shall be administered by a nine member committee, appointed by the President of the New Hampshire Bar Association with the approval of the association's Board of Governors, which committee shall include at least two public members. Five members shall constitute a quorum. All decisions of the committee shall be made by a majority of the members present and voting. The committee shall have the power to propose regulations to clarify the intent of this rule, which regulations shall become effective after review and approval by the court. Decisions of the committee as to whether or not to pay claims and the

amount of payments shall be within the committee's discretion, subject to the annual limits stated above, and will be reviewable only for clear abuse of discretion. Review of decisions of the committee shall be by a panel of three retired judges, appointed by the New Hampshire Supreme Court, whose decisions shall be final. Within 120 days after the end of each fund year, the New Hampshire Bar Association shall report to the court about the claims made, approved and paid, assessments received, income earned, and expenses incurred in the preceding fund year. Reasonable expenses incurred by the New Hampshire Bar Association in administering the fund, including overhead, staff time, and professional fees, shall be reimbursed by the fund as a cost of operation, subject to the review and approval of the court.

(6). *EFFECTIVE DATE.* This rule shall take effect on June 1, 1998, and payments from the fund shall be made only for defalcations occurring on or after that date. Fund years shall run from June 1 to May 31.