Rockingham
No. 97-819

RICHARD AVERILL

v.

PAUL R. COX & a.

October 31, 2000

*Charles E. Dibble, P.C.*, of Contoocook (*Charles E. Dibble* on the brief and orally), for the plaintiff.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Jack B. Middleton* and *Scott H. Harris* on the brief, and *Mr. Middleton* orally), for the defendants.

BRODERICK, J. The plaintiff, Richard Averill, appeals the Superior Court's (*Gray*, J.) orders granting the motion to dismiss filed by the defendants, Paul R. Cox and the law firm of Burns, Bryant, Hinchey, Cox & Rockefeller, P.A., and denying his motion for production of his case file. The plaintiff contends that the court erred by: (1) ruling that attorneys are *per se* exempt from the New Hampshire Consumer Protection Act (Act), RSA ch. 358-A (1984) (amended 1986, 1989, 1996, 1997, 1999); (2) finding that the parties are bound by an arbitration clause in their fee agreement; (3) finding his negligence and intentional tort claims to be fee disputes and therefore governed by the arbitration clause; and (4) refusing to order the defendants to produce his case file and trust account information. We affirm in part, reverse in part, and remand.

The relationship between the plaintiff and the defendants spans more than a decade and involves numerous transactions. We recite, however, only the relevant facts pled in the plaintiff's writ, *see ERG, Inc. v. Barnes*, 137 N.H. 186, 190, 624 A.2d 555, 558 (1993), or provided in the record on the motion to produce.

Due to the onset of severe depression in October 1985, the plaintiff was unable to continue working as a car salesman at Dreher-Holloway. Beginning in 1986, Attorney Cox represented him in a workers' compensation case against the dealership. At the outset of his representation, Cox and the plaintiff entered into an oral fee agreement under which Cox would be paid $85.00 per hour. In 1989, the parties changed the original fee agreement to a one-third contingency fee. The new agreement allowed either party to demand that any fee dispute be submitted to binding arbitration before the New Hampshire Bar Association's fee dispute committee.

After numerous appeals, including one to this court, *see Averill v. Dreher-Holloway*, 134 N.H. 469, 593 A.2d 1149 (1991), the plaintiff was awarded workers' compensation benefits totaling $215,494.91. In March 1992, Cox filed a motion with the superior court for attorney's fees and costs for the period between January 1986 and March 2, 1992, pursuant to RSA 281-A:44 (Supp. 1992) (amended 1993). Before a ruling was made, the plaintiff received a check from Dreher-Holloway for $9,774.67, which, at Cox's request, was endorsed to his law firm and deposited in the firm's trust account. The

trial court subsequently awarded Cox $70,000 in attorney's fees and $3,010.10 in expenses for the period between April 14, 1987, and March 2, 1992. In July 1992, Cox sent the plaintiff a check for $1,399.80, representing that it constituted the amount remaining from a check the plaintiff had endorsed to the firm, but did not provide him with an accounting of the amount retained by the firm.

In 1993, the plaintiff and Dreher-Holloway reached a lump sum settlement of $115,000 for all past and future benefits. Based on this settlement, Cox successfully applied to the department of labor for an additional $23,000, representing the contingency fee portion of the $115,000. In so doing, he did not inform the plaintiff of any countervailing arguments under the contingency fee agreement or advise him to seek independent counsel on the issue. Cox then withheld $11,000 of the settlement proceeds to pay two of the plaintiff's medical bills. In return, Cox received $3,400 from the medical payees for collecting this money from the plaintiff. Before the plaintiff received the net settlement proceeds, an additional $5,193.24 was deducted from the firm's trust account to cover unenumerated "services and expenses."

The plaintiff sued the defendants, alleging breach of contract, negligence, conversion, and violations of the Consumer Protection Act. In preparation for his suit, the plaintiff asked the defendants to produce "a complete copy of the entire contents of each and every file ever maintained by [them] in the course of representing the plaintiff," and a complete accounting of all trust accounts. The defendants objected, and the superior court denied the motion to produce as "extremely overbroad and bordering on vexation." The plaintiff's motion to reconsider was denied. The defendants then moved to dismiss. The trial court granted the motion, ruling that attorneys are *per se* exempt from the Consumer Protection Act, and that the remaining claims were governed by the fee agreement's arbitration clause. The plaintiff appeals the trial court's rulings on the motion to produce and the motion to dismiss.

I

The plaintiff argues that the trial court erred in ruling that attorneys are *per se* exempt from the Consumer Protection Act, *see* RSA ch. 358-A (1995), and thus dismissing his claims under the Act. He argues that the Act only exempts the "non-commercial" aspects of the practice of law, while the defendants assert that attorneys are not subject to liability under the Act given the exemption in RSA 358-A:3, I (1995). "The applicability of the Consumer Protection Act

involves a matter of statutory construction, and we begin our analysis by considering the plain meaning of [its] words . . . ." *Hughes v. DiSalvo*, 143 N.H. 576, 577, 729 A.2d 422, 423-24 (1999).

The Act forbids "any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2 (1995). It "is a comprehensive statute whose language indicates that it should be given broad sweep, [but] it is not unlimited in scope." *Hughes*, 143 N.H. at 578, 729 A.2d at 424 (quotation and ellipses omitted). Although the Act does not exempt any specific profession or occupation from its purview, it expressly excludes "[t]rade or commerce otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of this state or of the United States." RSA 358-A:3, I. Since 1986, we have articulated two competing interpretations of this exemption. *Compare Rousseau v. Eshleman*, 128 N.H. 564, 519 A.2d 243 (1986) (*Rousseau I*), *reh'g denied*, 129 N.H. 306, 529 A.2d 862 (1987) (*Rousseau II*) *with Gilmore v. Bradgate Assocs., Inc.*, 135 N.H. 234, 604 A.2d 555 (1992).

In *Rousseau I*, we held that the practice of law fell within the purview of the statutory exemption, RSA 358-A:3, I, because it is subject to regulation by the supreme court through its committee on professional conduct (committee), "a regulatory board acting under statutory (and constitutional) authority of this State." *Rousseau I*, 128 N.H. at 567, 519 A.2d at 245. In *Gilmore*, we held that RSA 358-A:3, I, exempts only transactions which are expressly permitted by any statutorily authorized regulatory board or officer. *Gilmore*, 135 N.H. at 239, 604 A.2d at 557. We reasoned that, given the broad purpose of the Act, "neither the legislature nor the *Rousseau [I]* court could have intended to exclude from the protection of the act the large number of industries which are subject to regulation in this State simply because the legislature has provided for regulation of that industry within a statutory framework." *Id.* at 238, 604 A.2d at 557. Because the disputed actions of the defendant real estate and condominium developers and sellers were not expressly permitted under the statutes designed to regulate the real estate and condominium industries, *see* RSA ch. 331-A (1995 & Supp. 1999); RSA ch. 356-B (1995 & Supp. 1999), we held that the transactions were not exempt, *see Gilmore*, 135 N.H. at 239, 604 A.2d at 557.

Our interpretations of RSA 358-A:3, I, in *Rousseau I* and *Gilmore* are in conflict. *Rousseau I* focuses on whether a trade or commerce is subject to a regulatory board or officer authorized by statute, while *Gilmore* focuses on whether a particular transaction is otherwise permitted by a statutorily authorized regulatory board or

officer. The plaintiff challenges the continuing vitality of *Rousseau I.*

■ Today, we reaffirm the interpretation of the statutory exemption provided by RSA 358-A:3, I, as articulated in *Rousseau I* and overrule *Gilmore.* The *Gilmore* court limited the reach of the statutory exemption to actions that are *expressly* permitted by a regulatory board or officer. *See Gilmore,* 135 N.H. at 239, 604 A.2d at 557 (Horton, J., concurring). This reasoning produces a troubling result because it is difficult to envision any commercial transaction which is prohibited by the Consumer Protection Act but expressly permitted by a statutorily authorized regulatory body. *See id.* at 241, 604 A.2d at 559 (Horton, J., concurring). Because we presume that the legislature would not "enact statutory language that would lead to an absurd result," *Atwood v. Owens,* 142 N.H. 396, 398, 702 A.2d 333, 335 (1997), we now reject the reasoning articulated in *Gilmore, see Gilmore,* 135 N.H. at 239, 604 A.2d at 557.

■ We also reaffirm the holding of *Rousseau I* that the practice of law falls within the scope of the exemption in RSA 358-A:3, I. *See Rousseau I,* 128 N.H. at 567, 519 A.2d at 245. As we have previously determined:

> Admission to the practice of law and regulation of the conduct of attorneys in this State has been dealt with as an area of shared responsibility between the legislative and judicial branches of government. *See* RSA 490:4; RSA chapter 311; N.H. CONST. pt. II, art. 73-a (Supp. 1985). Pursuant to its statutory and constitutional authority, this court not only has established an integrated bar association, membership in which is required as a condition of practicing law in this State, but also has established a professional conduct committee which has responsibility for regulating attorney conduct.

> The professional conduct committee of this court is, in our view, a regulatory board acting under statutory (and constitutional) authority of this State within the meaning of RSA 358-A:3, I.

*Id.* (citation omitted). While the court has the authority to regulate the admission of attorneys to the practice of law, and "the power to supervise, control and discipline those so admitted," *In re Unification of the New Hampshire Bar,* 109 N.H. 260, 263, 248 A.2d 709, 711 (1968); *see* RSA ch. 311 (1995 & Supp. 1999), such regulation must be

comprehensive to fall within the purview of RSA 358-A:3, I. "Mere licensing requirements, approval of plans or declarations, limited trade provisions, and consumer protection prohibitions" would not qualify for protection under the so-called statutory exemption. *See Gilmore*, 135 N.H. at 241-42, 604 A.2d at 558-59 (Horton, J., concurring). Further, trade or commerce qualifies for protection only if it is governed by a statutorily authorized regulatory regime that protects consumers from the same deception, fraud, and unfair trade practices as intended by RSA chapter 358-A. *Id.* We conclude that our regulation of the practice of law is comprehensive and protects consumers from the same fraud and unfair practices as RSA chapter 358-A. *See Gilmore*, 135 N.H. at 242, 604 A.2d at 559 (Horton, J., concurring). All aspects of the attorney-client relationship are subject to regulation by this court. *Cf. Cripe v. Leiter*, 703 N.E.2d 100, 106 (Ill. 1998). Indeed, the rules of professional ethics that attorneys are duty-bound to "observe most scrupu[l]ously are diametrically opposed to the code by which businessmen must live if they are to survive." *State Bar of Arizona v. Arizona Land Title & Trust Co.*, 366 P.2d 1, 9 (Ariz. 1961). The Rules of Professional Conduct ensure that "[t]he practice of law is not simply an occupation; it is a profession," *Daigle v. City of Portsmouth*, 137 N.H. 572, 576, 630 A.2d 776, 778 (1993), whose members seek "to avoid even the appearance of impropriety and, thus, strive[] to live by a higher standard of conduct than a layperson," *Wehringer's Case*, 130 N.H. 707, 719, 547 A.2d 252, 259 (1988) (quotations omitted).

Attorneys in this State are officers of the judicial branch of government who must secure and maintain membership in the bar association as a condition of the practice of law. *See Petition of Tocci*, 137 N.H. 131, 134, 624 A.2d 548, 549 (1993); SUP. CT. R. 42A. The bar association was founded "to improve the administration of justice; to foster and maintain high standards of conduct, integrity, competence and public service on the part of those engaged in the practice of law; . . . [and] to carry on a continuing program of legal research and education." *In re Unification of the New Hampshire Bar*, 109 N.H. at 264, 248 A.2d at 712. To foster these high standards, we require all lawyers admitted to practice law in this State to complete at least twelve hours of continuing legal education each year, including at least two hours in ethics. *See* SUP. CT. R. 53.

We recognize that the disciplinary actions taken by this court against members of the bar, however effective they may be to deter unprofessional conduct, are not designed to compensate clients harmed by attorney misconduct. *See Rousseau I*, 128 N.H. at 572,

519 A.2d at 249 (Johnson, J., dissenting). Accordingly, if plaintiffs could bring claims under the Act, they might receive greater damages than they would otherwise receive. *See* RSA 358-A:10 (1995) (providing for award of either two or three times amount of damages in case of knowing or willful violation of RSA chapter 358-A). The statutory exemption to the Act, however, does not require that remedies available to aggrieved consumers under qualifying regulatory schemes be *identical* to those provided in the Act. *See* 358-A:3, I; *Gilmore*, 135 N.H. at 241-42, 604 A.2d at 559 (Horton, J., concurring). Rather, it is sufficient that the regulatory scheme protects consumers from fraud and deception in the marketplace *"in a manner calculated to avoid the same ills* as RSA chapter 358-A." *Gilmore*, 135 N.H. at 241-42, 604 A.2d at 559 (Horton, J., concurring) (emphasis added). We conclude that the disciplinary measures exercised by this court protect the public as effectively from deceptive or unfair actions in the marketplace as would double or treble damages under the Act. *See* RSA 358-A:10; RSA 311:8. In some cases, the penalty of license suspension or revocation may be more severe than double or treble damages, and thus constitute a superior deterrent to deceptive or unfair actions. For instance, an attorney found guilty of embezzling $1000 from a client would be subject to a possible recovery of $3000 under the Act; the same attorney may be subject to disbarment under the rules. *See, e.g., Harrington's Case*, 100 N.H. 243, 123 A.2d 396 (1956). Indeed, since 1990, we have exercised our disciplinary power to suspend twenty-eight members of the bar and to disbar twenty-seven others. *See* RSA 311:8 (Supp. 1999).

Furthermore, since we last addressed the issue of attorneys' liability under the Act in *Rousseau I*, we have enacted several rules to protect the public and promote confidence in the bar, *see In re Proposed Public Protection Fund Rule*, 142 N.H. 588, 590, 707 A.2d 125, 126 (1998), with particular measures designed to secure clients' money and property. *See* SUP. CT. R. 50 (requiring attorneys to create or maintain interest-bearing trust accounts for clients' funds); SUP. CT. R. 50-A (requiring attorneys to file annual certificate of compliance to assure compliance with the requirements of Rule 50). In addition, Supreme Court Rule 55 was promulgated in order to reimburse clients who are financially harmed by the conduct of attorneys. *See* SUP. CT. R. 55 (requiring all members of bar to contribute annually to fund from which clients may recover up to $150,000 of money or property lost to the defalcation of any one lawyer, with an annual cap on all claims of $1,000,000).

We are aware that consumers in the legal marketplace may feel especially vulnerable to attorney misconduct because the legal profession is self-regulated. *See* Sahl, *The Public Hazard of Lawyer Self-Regulation: Learning from Ohio's Struggle to Reform Its Disciplinary System*, 68 U. CIN. L. REV. 65, 72-73, 111 (1999). To address this perception, we have amended Supreme Court Rules 37 and 37A, effective April 1, 2000, to ensure that all grievances or complaints filed against attorneys, as well as the committee's decisions on grievances or complaints, are available for public review. SUP. CT. R. 37, 37A. The committee maintains an index of docketed complaints against all attorneys. *See* SUP. CT. R. 37(4). Under the new rules, all disciplinary and non-disciplinary action taken by the committee, such as warnings, becomes available for public inspection. *See id.* Enactment of such regulations reflects our awareness that "[a]ny violation of . . . honesty and trust [from the legal practitioners in the State] wounds the profession as a whole," and constitutes further evidence of our commitment to maintain the "high standards of conduct, integrity, competence and public service on the part of those engaged in the practice of law." *In re Proposed Public Protection Fund Rule*, 142 N.H. at 592, 707 A.2d at 127.

Our holding is supported by the legislature's failure to expressly include the practice of law within the Act's scope since our decision in *Rousseau I* was issued almost fifteen years ago. *Cf. Cripe*, 703 N.E.2d at 106; *Vort v. Hollander*, 607 A.2d 1339, 1342 (N.J. Super. Ct. 1992), *cert. denied*, 617 A.2d 1221 (N.J. 1992). We presume that the legislature was aware of our prior decisions exempting attorneys from the Act, *see State v. Hermsdorf*, 135 N.H. 360, 363, 605 A.2d 1045, 1047 (1992), and has adopted our construction of the Act by amending other sections of the statute while failing to amend it to include lawyers, *see Del Norte, Inc. v. Provencher*, 142 N.H. 535, 539, 703 A.2d 890, 893 (1997).

## II

Next, the plaintiff appeals the trial court's dismissal of his contract and remaining tort claims pending arbitration. The trial court specifically found that the arbitration clause in the fee agreement between the plaintiff and the defendants was enforceable.

The arbitration clause states:

> At the instance [*sic*] of either Firm or Client, any dispute
> as to whether Firm or Client has failed to honor this

> Agreement or as to the amount of legal fees, will be submitted to the Fee Dispute Committee of the New Hampshire State Bar Association for Arbitration and prompt resolution and both Client and Firm agree to be bound by the results of such Arbitration. If it is necessary for Firm to file suit for collection of any sums due it under this Agreement, Client shall pay the reasonable attorneys fees and costs incurred for collection.

The trial court found the plaintiff's arguments against enforcing the arbitration clause unavailing because: (1) the plaintiff pursued arbitration as required by the agreement; (2) the plaintiff's breach of contract claim was based on the agreement he was now disavowing; and (3) the plaintiff's factual allegations in his writ repeatedly invoked the agreement. Thus, the trial court apparently concluded that the plaintiff could not simultaneously argue for and against the enforcement of the agreement.

█ Taking the plaintiff's factual allegations to be true and drawing all reasonable inferences in his favor, *see Konefal v. Hollis/Brookline Coop. School Dist.*, 143 N.H. 256, 258, 723 A.2d 30, 32 (1998), we hold that the trial court erred in finding that the plaintiff waived any right to dispute the validity of the arbitration clause because he inquired about pursuing arbitration. In his writ, the plaintiff alleged: "In accordance with the Fee Agreement, the plaintiff contacted the Fee Dispute Committee of the New Hampshire State Bar Association for arbitration of this dispute and was told that the Committee can only mediate a dispute but has no authority or mechanism to conduct a binding arbitration." Mere contact between the plaintiff and the fee dispute committee does not constitute a waiver of the right to question the enforceability of the arbitration clause. The plaintiff did not pursue arbitration beyond this one initial contact, and the defendants were not prejudiced or misled into believing that the plaintiff was choosing to resolve this dispute in arbitration rather than by litigation. *Cf. Logic Assoc's, Inc. v. Time Share Corp.*, 124 N.H. 565, 571, 474 A.2d 1006, 1009 (1984) (right to compel arbitration waived by filing of writ for damages in superior court). Thus, the trial court erred in finding that the plaintiff's attempt to pursue arbitration waived his right to contest the enforceability of the arbitration clause.

█ We also reject the trial court's conclusion that the plaintiff could not challenge the enforcement of the arbitration clause because he brought a claim under and invoked the very fee

agreement containing that clause. The plaintiff does not argue that the entire fee agreement between the parties is unenforceable. Instead, he alleges that the defendants breached the fee agreement by retaining fees in excess of the thirty-three percent provided for under its terms, while also contending that he should not be held to the agreement's arbitration clause. Contrary to the defendants' contentions, we conclude that the plaintiff was not required to elect between suing on the fee agreement or suing to rescind the contract. Under the facts of this case, the plaintiff could consistently allege that one part of the fee agreement was enforceable and that another was unenforceable. Here, the reasons the plaintiff alleges that the arbitration clause is not enforceable are separate from the enforceability of the remaining contract provisions.

While arbitration may allow disputes to be resolved in a more expeditious and less expensive manner than traditional litigation, it also has potential drawbacks, including the waiver of a right to a jury trial. Because of the special relationship between attorneys and clients, "arbitration agreements . . . [should not be] enforced on the same basis as ordinary commercial contracts; the standard of good faith and reasonableness . . . implies a heightened obligation of attorneys, consistent with the oath of their profession, to be fair and frank in specifying the terms of the attorney-client relationship." *Haynes v. Kuder*, 591 A.2d 1286, 1291 (D.C. App. 1991).

The California Court of Appeals has held that

> [t]he law ought not to decree a forfeiture of [the right to a jury trial] where the client has not been made aware of the existence of an arbitration provision or its implications. Absent notification and at least some explanation, the client cannot be said to have exercised a real choice in selecting arbitration over litigation.

*Lawrence v. Walzer & Gabrielson*, 256 Cal. Rptr. 3d 6, 9 (Ct. App. 1989) (quotations and brackets omitted). The *Lawrence* court noted that the arbitration clause was part of a retainer agreement drafted by the defendant attorneys and presented to the client for her signature and was not the product of negotiation. *Id.* at 10.

In this case, the parties' attorney-client relationship commenced approximately three years before they entered into the written fee agreement which contained the arbitration clause. In October 1989, while the plaintiff's claim was pending before the superior court, Cox sent the plaintiff a letter which stated, in part:

> I enclose this form agreement reflecting our prior oral agreement and ask you to sign it and return it to the office, at which time I will sign and return a copy to you. If you have any questions regarding this matter, please do not hesitate to write or call.

The plaintiff alleges that at no time was the arbitration clause explained to him.

■ In *Terzis v. Estate of Whalen*, 126 N.H. 88, 489 A.2d 608 (1985), we held that an attorney seeking to enforce a fee agreement entered into after the commencement of the attorney-client relationship "has the burden of proving that it is fair and reasonable, and that the client had full knowledge of the facts and of his legal rights with relation thereto." *Terzis*, 126 N.H. at 92, 489 A.2d at 612 (quotation omitted). We see no reason why the same rule should not apply to an attorney who seeks to enforce an arbitration clause in a fee agreement entered into after the commencement of the attorney-client relationship. Because the trial court failed to require the defendants to demonstrate that the arbitration clause is enforceable, we remand for such a determination.

, At this time, we need not address the plaintiff's contention that the trial court incorrectly categorized his tort claims as fee disputes subject to arbitration because this claim of error will be rendered moot if the arbitration clause is unenforceable.

### III

Finally, the plaintiff contends that the trial court erred in denying his motion to produce documents in the possession of the defendants. The plaintiff's original motion requested "[a] complete copy of the entire contents of each and every file ever maintained by the defendants in the course of representing the plaintiff in any manner whatsoever," and "[a] complete accounting of all trust accounts ever maintained by the defendants concerning any representation of the plaintiff in any fashion." This motion was denied by the trial court as overbroad. Subsequently, the plaintiff moved to reconsider, arguing that "[u]nder the standard of practice in New Hampshire, the entire original file generated in the course of any representation of a client is the property of said client and must be delivered to him/her on request." Although the plaintiff focuses his argument on appeal on the question of who owns the file, the defendants do not appear to dispute the plaintiff's right to the entire file. The real debate focuses on who must pay to duplicate the plaintiff's file so

that all parties may have a copy. In resolving this dispute, we must first determine who owns the file.

█ This is a matter of first impression in this jurisdiction. Therefore, we look to other jurisdictions to guide us in our determination. *See Simpson v. Calivas*, 139 N.H. 1, 5, 650 A.2d 318, 321 (1994). A majority of jurisdictions follow the rule that once the attorney-client relationship has ended, the client's case files are the property of the client and should be turned over. *See generally* 7 AM. JUR. 2D *Attorneys at Law* § 193 (1997); *Sage Realty v. Proskauer Rose Goetz*, 689 N.E.2d 879, 881 (N.Y. 1997); *In re X.Y.*, 529 N.W.2d 688, 690 (Minn. 1995). Our Rules of Professional Conduct support this approach. Rule 1.16(d) states: "Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as . . . surrendering papers and property to which the client is entitled . . . ." N.H. R. PROF. CONDUCT 1.16(d); *see also* ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT Rule 1.16(d) commentary at 256 (3d ed. 1996). Thus, we conclude that a client's file belongs to the client, and upon request, an attorney must provide the client with the file.

We note that some jurisdictions distinguish between an "end product," which is the client's property, and "work product," which is the attorney's property. *See, e.g., Sage Realty*, 689 N.E.2d at 881-82. We decline at this time to delineate between documents in the plaintiff's file. The defendants have not alleged that the plaintiff is not entitled to portions of the file. Rather, they argue that they should not have to provide copies of the file free of charge.

██ That the plaintiff owns his file does not end the analysis, however, because jurisdictions differ on whether the attorney or the client pays for copying. We agree with those jurisdictions that require the attorney to bear the expense of retaining a copy. *See, e.g., In re X.Y.*, 529 N.W.2d at 690. This approach has the benefit of ease of administration and is consistent with our rules of professional conduct. *See* N.H. R. PROF. CONDUCT 1.16(d). Thus, absent a written agreement requiring the client to pay reasonable costs of copying his or her file, if an attorney wishes to retain a copy of the client's file, the attorney must pay the associated costs. *See In re X.Y.*, 529 N.W.2d at 690. We do not rule out the possibility that in certain situations, clients may not be able to receive their entire file. *See, e.g., Sage Realty*, 689 N.E.2d at 883 (requiring substantial showing of good cause, such as disclosure would violate a duty of nondisclosure owed to a third party). In this case, however, we see no reason why the plaintiff cannot obtain his entire file. Therefore,

the defendants must turn over the plaintiff's file. They may make a copy of the file at their own expense.

For future guidance, we note that any provision in a written agreement to have a client pay for the costs of copying his or her file upon termination of representation should be clearly indicated. The fee agreement in this case only requires that the plaintiff pay out-of-pocket expenses, including the cost of photocopies. It does not clearly indicate that the plaintiff must pay for the cost of copying his own file; rather, it indicates that the plaintiff must pay for copies related to the work that the defendants perform.

Although the plaintiff's original motion sought an accounting of all trust accounts maintained by the defendants, the plaintiff has not, other than by a passing reference, argued that the trial court erred in denying his request. Therefore, we need not address it and the issue may be reconsidered upon remand. *See N.E. Tel. & Tel. Co. v. City of Franklin*, 141 N.H. 449, 454, 685 A.2d 913, 918 (1996).

*Affirmed in part; reversed in part; and remanded.*

JOHNSON, J., sat for oral argument but retired prior to the final vote; THAYER, J., sat for oral argument but resigned prior to the final vote; BROCK, C.J., and HORTON, J., concurred.