Carroll
No. 2011-028

JO ANNE RAINVILLE & a.

v.

LAKES REGION WATER COMPANY, INC. & a.

Argued: October 19, 2011
Opinion Issued: February 10, 2012

*Cooper Cargill Chant, P.A.*, of North Conway (*Christopher T. Meier* on the brief and orally), for the plaintiffs.

*Nelson, Kinder, Mosseau & Saturley, PC*, of Manchester (*Richard C. Nelson* and *Adam J. Chandler* on the brief, and *Mr. Nelson* orally), for the defendants.

DALIANIS, C.J. This is an interlocutory appeal from an order of the Superior Court (*Houran*, J.) partially granting and partially denying the summary judgment motion filed by the defendants, Lakes Region Water Company and Thomas Mason (collectively, LRWC). *See* SUP. CT. R. 8. The superior court transferred a single question for our review:

Did the superior court err in concluding that the defendants are not exempt from the Consumer Protection Act pursuant to RSA 358-A:3 to the extent the defendants allegedly misrepresented that the water they provided was safe for use and consumption?

We answer this question in the affirmative and reverse the trial court's denial of partial summary judgment as to the claims of the plaintiffs, Jo Anne Rainville, Carl Beher, Lisa Mullins d/b/a The Olde Village Store, and approximately fifty others, under the Consumer Protection Act (CPA) seeking damages for alleged misrepresentations about the quality of water provided. We remand for further proceedings consistent with this opinion.

We accept the statement of the case and facts as presented in the interlocutory appeal statement and rely upon the record for additional facts as necessary. *See State v. Hess Corp.*, 159 N.H. 256, 258 (2009). Defendant LRWC is a small, privately-owned water company based in Moulton-borough, which owns and operates several public water systems in New Hampshire. Its sole shareholders are defendant Mason and his wife. LRWC is a public utility regulated by the New Hampshire Public Utilities Commission (PUC).

In 1995, LRWC purchased the Tamworth Water Works, which supplies water to Tamworth residents and businesses. In 1998, LRWC installed a bedrock well to service the Tamworth Water Works system. In 2004, this well, Well·004, was shut down because its water contained levels of uranium above the maximum allowed by the New Hampshire Department of Environmental Services (DES). Subsequently, LRWC replaced Well 004 with a new well, Well 005.

In August 2007, DES employees discovered that Well 004 was active, and a subsequent test of water from the Tamworth Water Works found uranium levels greater than those allowed by DES. In September 2007, LRWC severed the water lines and electrical connections to Well 004. Thereafter, the uranium levels of the water from the Tamworth Water Works returned to levels that met DES requirements.

Also in September 2007, PUC staff requested the PUC to formally investigate, among other things, whether LRWC had the "managerial and financial capacity to provide safe and adequate service to its customers." As part of its investigation, the PUC observed that the New Hampshire Attorney General was investigating the allegation that LRWC had reconnected Well 004. Because of the pending investigation by the attorney general, the PUC kept its investigation open so as to continue to monitor LRWC and protect the interests of its customers.

In August 2008, the plaintiffs brought suit against LRWC alleging violations of the CPA, breach of contract and other claims. In August 2009,

the defendants moved for partial summary judgment as to the plaintiffs' CPA claims, arguing that because they are involved in a "trade or commerce" that falls within the jurisdiction of the PUC, their conduct is exempt from the CPA. *See* RSA 358-A:3, I (2009). The trial court granted the motion as it pertained to claims that the defendants overcharged for contaminated water because it found that these claims were related to the PUC's exclusive jurisdiction over ratemaking. The trial court denied the motion as to claims that, by failing to disclose the level of uranium in the water, the defendants misrepresented that the water was safe for consumption and free from contamination, reasoning that these claims were not part of the PUC's exclusive jurisdiction over ratemaking and, thus, not exempt from the CPA.

The sole issue for our review is whether the plaintiffs' claim that the defendants misrepresented that the water was safe for consumption is exempt from the CPA. Resolving this issue requires statutory construction. The interpretation of a statute is a question of law, which we review *de novo. Billewicz v. Ransmeier*, 161 N.H. 145, 151 (2010). We determine the intent of the legislature as expressed in the words of the statute considered as a whole. *Id.* When the language of a statute is clear on its face, its meaning is not subject to modification. *Id.* Further, we will neither consider what the legislature might have said nor add words that it did not see fit to include. *Id.*

Our analysis starts with the plain meaning of the relevant statutes. *See State v. Empire Automotive Group*, 163 N.H. 144, 145 (2011). Under the CPA, it is "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." RSA 358-A:2 (2009). "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," is a form of unfair competition specifically prohibited by the CPA. RSA 358-A:2, VII. The plaintiffs have alleged that the defendants violated this provision of the CPA by knowingly misrepresenting that the water was safe and met DES standards for uranium.

■ RSA 358-A:3, I, exempts from the CPA:

> *Trade or commerce that is subject to the jurisdiction of* the bank commissioner, the director of securities regulation, the insurance commissioner, *the public utilities commission,* the financial institutions and insurance regulators of other states, or federal banking or securities regulators who possess the authority to regulate unfair or deceptive trade practices. This paragraph includes trade or commerce under the jurisdiction of, and regu-

lated by, the bank commissioner pursuant to RSA 361-A, relative to retail installment sales of motor vehicles.

(Emphases added.) RSA 358-A:1, II (2009) defines " '[t]rade' " and " 'commerce' " to "include the advertising, offering for sale, sale, or distribution of any services and property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state." Thus, the CPA does not apply to claims of unfair competition or deceptive practices in selling or distributing a service that is subject to the PUC's jurisdiction.

The term "jurisdiction" is not defined in the CPA, but its plain meaning is: "the legal power, right, or authority to hear and determine a cause," "legal power to interpret and administer the law," or "[the] power or right to exercise authority: CONTROL." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1227 (unabridged ed. 2002). Accordingly, to determine when offering for sale or distributing a service is "subject to the jurisdiction of" the PUC, we examine the statutes that define the PUC's powers and authority.

The PUC has "general supervision of all public utilities and the plants owned, operated or controlled by the same." RSA 374:3 (2009); *see Appeal of Pennichuck Water Works*, 160 N.H. 18, 33 (2010). Generally, any entity that owns or operates a water system or part thereof is deemed a "public utility." *Appeal of Pennichuck Water Works*, 160 N.H. at 33 (quotation omitted); *see* RSA 362:2, I (2009) (defining "public utilities" generally); RSA 362:4 (2009) (explaining when water company is public utility). Here, it is undisputed that LRWC, which sells and distributes water to the public, is a "public utility" subject to the PUC's jurisdiction. Thus, the trade or commerce in which LRWC is engaged — selling and distributing water to the public — is subject to the jurisdiction of the PUC.

Moreover, the plaintiffs have alleged that the defendants engaged in deceptive practices in conducting this very trade or commerce. They allege that the water LRWC sold and distributed to the public was unsafe, and that LRWC misrepresented that the water was, in fact, safe. These allegations concern the very trade or commerce that is subject to the PUC's jurisdiction — selling and distributing water. *See Empire Automotive Group*, 163 N.H. at 147. Accordingly, the plaintiffs' claim may not be brought under the CPA because it concerns trade or commerce that is subject to the PUC's jurisdiction and is exempt from the CPA.

The plaintiffs argue, and the trial court ruled, that the CPA exempts only trade or commerce related to the PUC's jurisdiction over public utility

rate-setting. *See Bacher v. Public Serv. Co. of N.H.*, 119 N.H. 356, 357 (1979) ("Except in narrowly defined instances, the ratemaking power of the [PUC] is plenary."). This interpretation of RSA 358-A:3, I, reads into the statute a limitation that does not exist. The CPA exempts *any* "[t]rade or commerce" that is subject to the PUC's jurisdiction. RSA 358-A:3, I. It does not exempt only that which involves setting consumer rates. We will not read a limitation into the statute that the legislature did not see fit to include. *See Ransmeier*, 161 N.H. at 151.

■ The plaintiffs also argue that the PUC's jurisdiction does not extend to deceptive practices related to water quality. This frames the issue incorrectly. The issue is not whether a party's *deceptive practice* is subject to the PUC's jurisdiction, but whether the practice occurred in the conduct of *"[t]rade or commerce"* that is subject to the PUC's jurisdiction. RSA 358-A:3, I (emphasis added). The CPA exempts from its purview all "[t]rade or commerce" that is subject to the jurisdiction of certain state and federal agencies and officers, including the PUC. *Id.* This means that if a party engages in an unfair method of competition or unfair or deceptive practice in the conduct of "[t]rade or commerce" that is subject to the jurisdiction of one of these agencies or officers, the CPA does not apply.

The plaintiffs' argument may be based upon an assumption that our cases interpreting a prior version of the CPA still apply. The prior version of the CPA did not exempt any particular profession or occupation from its purview; it excluded only "[t]rade or commerce otherwise permitted under laws as administered by any regulatory board or officer acting under statutory authority of this state or of the United States." RSA 358-A:3, I (1995) (amended 2002, 2004); *see Averill v. Cox*, 145 N.H. 328, 331 (2000). In *Averill*, we decided that this exemption applied to trade or commerce subject to a regulatory board or officer authorized by statute. *Averill*, 145 N.H. at 331, 332-33. We also explained that for regulation to fall within the purview of RSA 358-A:3, I, it had to be comprehensive and had to protect consumers from the same fraud and unfair practices as the CPA. *Id.* at 332-33.

After we decided *Averill*, the legislature amended RSA 358-A:3, I. Now, RSA 358-A:3, I, exempts any trade or commerce that is subject to the jurisdiction of only a few specified agencies and officers: the bank commissioner, the director of securities regulation, the insurance commissioner, the PUC, the financial institutions and insurance regulators of other states, and federal banking and security regulators who possess the authority to regulate unfair and deceptive trade practices. Thus, *Averill* does not govern our construction of the CPA exemption at issue.

■ Moreover, contrary to the plaintiffs' assertions, concerns about water quality fall squarely within the PUC's jurisdiction. Before any entity may operate as a public utility in New Hampshire, it must first obtain the PUC's permission and approval. *Appeal of Pennichuck Water Works*, 160 N.H. at 33; *see* RSA 374:22, I (2009). Water companies may not obtain such permission and approval "without first satisfying any requirements of [DES] concerning the suitability and availability of water for the applicant's proposed water utility." RSA 374:22, III (2009). Once a water company obtains the PUC's permission and approval to become a "public utility," it must "furnish such service and facilities as shall be *reasonably safe and adequate* and in all other respects just and reasonable." RSA 374:1 (2009) (emphasis added).

If the PUC determines that the water company "has declined or unreasonably failed to render service" or has rendered inadequate service, the PUC, either on its own motion or on the motion of "any interested party," may "withdraw[] from a public utility its authority to engage in business." RSA 374:28 (2009). The PUC may also direct the attorney general to bring an action against a public utility if the PUC is "of opinion that a public utility is failing or omitting, or about to fail or omit, to do anything required of it by law or by order of the [PUC], or is doing anything, or about to do anything . . . contrary to, or in violation of, law or any order of the [PUC]." RSA 374:41 (2009). Additionally, "whenever the [PUC] finds that a public utility . . . having gross annual revenues of less than $2,000,000 is failing to provide adequate and reasonable service to its customers," and that this failure poses "a serious and imminent threat to the health and welfare" of the utility's customers, the PUC may appoint a receiver or direct its staff "to take such temporary action as is necessary to assure continued service." RSA 374:47-a (2009).

Further, pursuant to RSA chapter 365, "[a]ny person" may file a petition with the PUC setting forth "any thing or act claimed to have been done or to have been omitted by any public utility in violation of any provision of law." RSA 365:1 (2009). If the public utility does not make reparation for any alleged injury and does not cease its illegal activities, and the PUC finds that there are "reasonable grounds" for the complaint, the PUC must investigate the complaint and "take such action within its powers as the facts justify." RSA 365:4 (2009). The PUC may also inquire on its own motion "as . . . to any act or thing having been done or having been omitted or proposed by any [public] utility in violation of any provision of law." RSA 365:5 (2009). RSA 365:41 (2009) allows the PUC to impose a civil penalty against "[a]ny public utility" that violates "any provisions of [Title XXXIV: Public Utilities], or fails, omits or neglects to obey, observe or comply with"

any PUC order, "not to exceed $250,000 or 2.5 percent of the annual gross revenue that the utility received from sales in the state, whichever is lower."

Thus, contrary to the plaintiffs' assertions, the PUC has jurisdiction over the quality of water provided by a public utility. The PUC cannot allow a water company to operate as a public utility unless the company satisfies DES's requirements for providing safe water. *See* RSA 374:22, III. If the PUC determines that the water company has provided the public with inadequate water service, the PUC may withdraw its permission that allows the water company to operate as a public utility. *See* RSA 374:28. And, if the PUC is of the opinion that the public utility has violated any law, including those regarding providing safe water, it may direct the attorney general to bring an action against the public utility. *See* RSA 374:41. For certain water companies, if the PUC determines that a water company has failed to provide "adequate and reasonable service" to its customers and that this failure has posed "a serious and imminent threat to the health and welfare" of the utility's customers, the PUC may also appoint a receiver or direct its staff to take "such temporary action as is necessary" to assure continued service to the water company's customers. RSA 374:47-a. The PUC may also initiate an inquiry into any alleged unlawful activity by a public utility, and may assess a civil penalty against the utility. *See* RSA 365:5, :41.

Our recent decision in *Empire Automotive Group* is factually distinguishable from this case. The defendant in that case was licensed by the New Hampshire Banking Department as a seller of motor vehicles subject to retail installment sales contracts. *Empire Automotive Group*, 163 N.H. at 145. The defendant was indicted by a grand jury for violating the CPA by placing inspection stickers on vehicles sold to consumers under installment sales contracts, knowing that the vehicles had not actually passed inspection. *Id.* The defendant argued that because it was licensed under RSA chapter 361-A, and subject to the jurisdiction of the bank commissioner, its conduct was exempt from the CPA. *Id.* at 145-46. We disagreed. *Id.* at 146.

We observed that the "[t]rade or commerce" subject to the jurisdiction of the bank commissioner under RSA chapter 361-A involved only the sale of motor vehicles pursuant to retail installment sales contracts. *Id.*; *see* RSA 358-A:3, I (exempting from the CPA "[t]rade or commerce that is . . . under the jurisdiction of, and regulated by the bank commissioner pursuant to RSA 361-A, relative to retail installment sales of motor vehicles"). We implied that the "[t]rade or commerce" that is subject to the bank commissioner's jurisdiction is the financing of vehicles pursuant to retail sales installment contracts. *Empire Automotive Group*, 163 N.H. at 146; *see also* RSA 361-A:2, I (2009) ("No person shall engage in the business of a sales finance company or retail seller in this state" without first obtaining

a license to do so from the bank commissioner), :3, I-a(c), (h) (Supp. 2011) (bank commissioner may suspend or revoke license of person selling motor vehicles to buyers under retail sales installment contracts for fraudulently misrepresenting certain borrowing terms or for engaging in dishonest or unethical practices in making or collecting on retail installment contracts), :7 (2009) (setting forth the requirements and prohibitions relative to retail installment sales contracts).

In *Empire Automotive Group*, "the fact that the two motor vehicles in question may have been sold under retail installment contracts ha[d] nothing whatsoever to do with the fraudulent conduct alleged in the indictment"; thus, the conduct was unrelated to the financing terms under which the vehicles were sold. *Empire Automotive Group*, 163 N.H. at 146. We ruled, therefore, that the trade or commerce at issue was the sale of motor vehicles generally, not their financing under retail sales installment contracts. *See id.* at 147. Because the bank commissioner did not have jurisdiction over the sale of motor vehicles generally, and because this was the trade or commerce at issue, we held that the exemption did not apply. *Id.*

In this case, by contrast, providing water to the public, which is the trade or commerce subject to the PUC's jurisdiction, is related to the alleged fraudulent conduct. The alleged fraud concerned the delivery of safe water. Moreover, while in *Empire Automotive Group*, the bank commissioner had no authority over the trade or commerce at issue (the sale of motor vehicles, generally), here, the PUC has express authority over selling or distributing water to the public.

For all of the above reasons, therefore, we reverse the trial court's denial of partial summary judgment as to the plaintiffs' claims under the CPA that sought damages for the defendants' alleged misrepresentations about the quality of the water provided and remand for further proceedings consistent with this opinion.

*Reversed and remanded.*

HICKS, CONBOY and LYNN, JJ., concurred.