Merrimack
No. 2011-574

KAREN L. LAWRENCE

v.

PHILIP MORRIS USA, INC.

Argued: June 7, 2012
Opinion Issued: August 21, 2012

94

*Douglas, Leonard & Garvey, P.C.*, of Concord (*Charles G. Douglas* and *Jason R.L. Major* on the brief), and *Korein Tillery LLC*, of St. Louis, Missouri and Chicago, Illinois (*Stephen M. Tillery* and *Maximilian C. Gibbons* on the brief, and *Mr. Tillery* orally), for the plaintiff.

*McLane, Graf, Raulerson & Middleton, P.A.*, of Manchester (*Wilbur A. Glahn, III*, on the brief and orally), and *Arnold & Porter LLP* of New York, New York, and Washington, D.C. (*Philip Curtis & a.* on the brief), for the defendant.

DALIANIS, C.J. This is an interlocutory appeal from an order of the Superior Court (*Smukler*, J.) that certified a class represented by the plaintiff, Karen L. Lawrence, consisting of "all individuals who purchased Marlboro Lights cigarettes in New Hampshire from January 1, 1995, until the date of trial." *See* SUP. CT. R. 8. The superior court transferred a single question for our review:

> Did the Superior Court err in its application of New Hampshire law when it granted Plaintiff's Motion for Class Certification?

We answer this question in the affirmative and reverse the trial court's certification order.

*I. Background*

We accept the statement of the case and facts as presented in the interlocutory appeal statement and rely upon the record for additional facts as necessary. *See Rainville v. Lakes Region Water Co.*, 163 N.H. 271, 273 (2012). The plaintiff alleges that she purchased and consumed Marlboro Lights cigarettes (Lights) from approximately 1975 until February 2001. She alleges that the defendant, Philip Morris USA, Inc. (Philip Morris), by using the name "Lights" and describing the cigarettes as "Lowered Tar & Nicotine," violated the New Hampshire Consumer Protection Act (CPA). *See* RSA ch. 358-A (2009 & Supp. 2011). These descriptions, she contends, falsely represented that Lights would deliver less tar and nicotine than other cigarettes.

The plaintiff alleges that the filters of Lights had ventilation holes that diluted the tar and nicotine delivered per puff as measured by smoking machines. She alleges that Philip Morris specifically designed Lights to "pass" the machine tests while delivering to human smokers the same amount of tar and nicotine delivered by regular Marlboro cigarettes (Regulars). The plaintiff thus argues that the product Philip Morris actually sold, a cigarette that delivered the same levels of tar and nicotine as a regular Marlboro, was worth less than the product Philip Morris promised, a cigarette that delivered less tar and nicotine. She seeks actual and statutory damages based upon this difference in value. She does not seek personal injury damages.

The plaintiff initiated this action in March 2002. In November 2010, pursuant to RSA 358-A:10-a, which allows class representation in CPA claims, the trial court certified a class represented by the plaintiff, consisting of all individuals who purchased Lights in New Hampshire from the date they were first introduced into New Hampshire's stream of commerce until the date of trial. The trial court later adjusted the class period so that it began on January 1, 1995. The only issue before us is whether the trial court properly certified this class.

*II. Analysis*

*A. Standard of Review*

Philip Morris argues that the trial court erred by certifying the class because common issues of law or fact do not predominate over questions affecting only individual class members. *See* RSA 358-A:10-a, II(e)(3). In

deciding this question, because the parties do not argue otherwise, we assume, without deciding, that our case law discussing the predominance requirement for classes certified under Superior Court Rule 27-A applies. *See Petition of Bayview Crematory*, 155 N.H. 781, 785-86 (2007) (acknowledging that Rule 27-A(a)(2) combines the requirement that the proposed class share at least one significant question of law or fact in common and the requirement that common issues predominate).

■ To satisfy the predominance test, the issues common to the proposed class must outweigh the issues that are particular to the individual class members. *Id.* at 785. The test's purpose is to promote economies of time, effort, and expense and to promote uniformity of decision as to persons similarly situated. *Id.* at 785-86. "To achieve these pragmatic goals, the trial court must consider how the case will be tried by identifying the substantive issues that will control the outcome of the case, assessing which issues will predominate, and determining whether those issues are common to the class." *Id.* at 786.

■ Thus, the trial court must go beyond the facts alleged in the pleadings to understand the claims, defenses, relevant facts, and applicable substantive law and meaningfully determine the certification issues. *Cantwell v. J & R Props. Unlimited*, 155 N.H. 508, 512 (2007). This rigorous analysis requires that the trial court receive enough evidence, by affidavits, documents, or testimony, to be satisfied that the plaintiff has met each class certification requirement. *Id.* at 512-13. The trial court must employ its discretion, however, to avoid transforming certification proceedings into "protracted mini-trial[s] of substantial portions of the underlying litigation." *Id.* at 512 (quotation omitted).

We will not overturn orders granting or denying class certification absent an unsustainable exercise of discretion. *Petition of Bayview Crematory*, 155 N.H. at 784. A trial court unsustainably exercises its discretion when a relevant factor deserving of significant weight is overlooked, or "when an improper factor is accorded significant weight, or when the court considers the appropriate mix of factors, but commits a palpable error of judgment in calibrating the decisional scales." *Id.* (quotation omitted). Within this rubric, a trial court necessarily exceeds the limits of its discretion when its decision or judgment depends upon an incorrect view of the law. *Id.* And, a trial court's answer to an abstract legal question, even though made in the course of reaching a generally discretionary judgment, engenders *de novo* review. *Id.* Finally, because the trial court in this case relied only upon a paper record and "all of the documents from below are available for our

perusal, we . . . give less than ordinary deference to the trial court's factual findings." *Hillside Assocs. of Hollis v. Maine Bonding & Cas. Co.*, 135 N.H. 325, 330 (1992).

### B. Individual Issues Regarding Injury Predominate

"This is not the first attempt at certification of a class of purchasers of light cigarettes." *In re: Light Cigarettes Mktg. Sales Prac. Litig.*, 271 F.R.D. 402, 413 (D. Me. 2010) (citing cases). Of the courts that have considered the issue, "[e]leven of the thirteen denied class certification; two granted it." *Id.* The two courts that granted class certification employed less rigorous class-certification standards than New Hampshire law requires. *Compare Cantwell*, 155 N.H. at 512-13 (court must go beyond facts alleged in pleadings), *with Craft v. Philip Morris Companies, Inc.*, 190 S.W.3d 368, 382-85 (Mo. Ct. App. 2005) (assuming truth of plaintiff's allegations and legal conclusions); *compare* RSA 358-A:10-a, II(e)(3) (requiring that common legal or factual issues predominate), *with Aspinall v. Philip Morris Companies, Inc.*, 813 N.E.2d 476, 479, 492 (Mass. 2004) (certifying class under Massachusetts consumer protection statute), *and Moelis v. Berkshire Life Ins. Co.*, 887 N.E.2d 214, 220 (Mass. 2008) (explaining that Massachusetts consumer protection statute "does not require that common issues predominate over individual ones").

In this case, Philip Morris argues that individual issues about injury will predominate because not all class members were injured by its representations about Lights, and determining which class members were, in fact, injured, will require individual proof and inquiries. Philip Morris asserts that class members who were exposed to publicly disseminated information about the tendency of smokers to "compensate" when smoking light cigarettes, thereby obtaining the same amount of tar and nicotine as when smoking regular cigarettes, cannot show that they were deceived by Philip Morris's representations and, therefore, cannot show injury. *See Becksted v. Nadeau*, 155 N.H. 615, 620 (2007) (trial court unsustainably exercised discretion by granting defendants' motion for directed verdict based upon finding that plaintiffs failed to introduce sufficient evidence of deceit). These class members, Philip Morris reasons, received exactly what they expected — a cigarette that was capable of delivering the same levels of tar and nicotine as a regular cigarette — and, therefore, sustained no injury. *Cf. Cleary v. Philip Morris USA, Inc.*, 265 F.R.D. 289, 292-93 (N.D. Ill. 2010) (denying class certification upon lack of typicality because of "likelihood that some significant proportion of class members experienced no injury at all").

Philip Morris contends that individual inquiries will be necessary to determine the extent of each class member's knowledge about the "com-

pensation" phenomenon — that is, the tendency of smokers of light cigarettes to inhale more deeply, hold the smoke in their lungs longer, or cover up the ventilation holes in the cigarette paper or filter, in order to receive the same amount of tar and nicotine as when smoking Regulars. Because of the likelihood that numerous class members were exposed to information about the compensation phenomenon, individual inquiries will predominate, Philip Morris argues, and, therefore, class certification is improper. *See Light Cigarettes Mktg. Sales Prac. Litig.*, 271 F.R.D. at 421 (individual inquiries related to when class members learned truth about light cigarettes "weigh[ed] against the predominance of commonality"); *Mulford v. Altria Group, Inc.*, 242 F.R.D. 615, 629 (D.N.M 2007) (individual issues relating to, among other things, the amount of tar and nicotine delivered by light cigarettes outweighed common issues in similar consumer action).

By certifying the class, the trial court appears to have concluded both that class members could establish lack of knowledge by relying upon common evidence, and that common issues about lack of knowledge would predominate. We agree with Philip Morris that this was error.

In addressing this issue, we find instructive the reasoning of *In re Ford Motor Co. E-350 Van Products Liability Litigation (No. II)*, Civil Action No. 03-4558, MDL No. 1687, 2012 WL 379944, at *13-14 (D.N.J. Feb. 6, 2012). In that case, consumers sued an automobile manufacturer over a representation that its van could carry fifteen passengers when, in fact, the van's unusually high rollover rate made it unfit to do so. *In re Ford Motor Co.*, 2012 WL 379944, at *1. In analyzing class certification, the court noted that "numerous public reports, articles, and broadcasts" documented the van's handling problems and that one of the case's original plaintiffs had used his knowledge of these problems as leverage when negotiating the purchase of his van. *Id.* at *14 n.9, *15.

The court ruled that, "if Plaintiffs have actual knowledge of the handling defect prior to the purchase . . . these Plaintiffs have not shown causation [of injury]. Identifying which putative class members purchased under similar circumstances will require individualized inquiries that are impracticable in class litigation." *Id.* As in this case, the plaintiffs' "primary theory of damages at the class certification stage [was] a common benefit-of-the-bargain injury." *Id.* The court explained that "[i]t stands to reason that the consumers who saw these reports and understood the . . . van to have significant handling problems will have a difficult time proving causation, and in doing so, they would not rely on common proof." *Id.* Rather, "it would take individualized causation inquiries to determine which putative class members saw such news reports prior to their purchase of [the van] and understood the van to have handling problems." *Id.* As here, the plaintiffs'

proposed class made "no effort to exclude persons having [such] knowledge," and the court, therefore, declined to certify the class. *Id.*

In this case, the record establishes that between 1976 and 1995, substantial information was available to consumers concerning the fact that light cigarettes are as harmful to smokers as regular cigarettes. Indeed, hundreds of publications and television news reports between 1976 and 1995 informed consumers that light cigarettes were no less harmful than regular cigarettes. The trial court itself acknowledged that, during this period, some consumers may have known their smoking behavior could result in receiving greater amounts of tar and nicotine than smoking machines recorded.

The declaration of Janette Thomas Greenwood, a history professor at Clark University, submitted by Philip Morris in opposition to the plaintiff's motion for class certification, describes the detailed information about light cigarettes available to consumers from 1976 to 1995. Her declaration identifies numerous studies published during that time frame, which concluded that smokers of light cigarettes receive the same amount of tar and nicotine as smokers of regular cigarettes because of the compensation phenomenon. Her declaration also describes the national and regional news reporting about these studies.

Among the studies described in Professor Greenwood's declaration are:

— a May 1976 British study finding that smokers who switched to low tar and nicotine cigarettes compensated by smoking more. This study was reported in *Consumer Reports* and on NBC's "Today" show.

— a May 1978 Harvard study finding that "most smokers hold the smoke from low-tar cigarettes in their lungs longer in an apparent effort to extract more satisfaction from them." (Quotation omitted.) This study was reported in the *Concord Monitor*, the *Boston Globe*, NBC "Nightly News," and CBS "Evening News."

— a June 1980 study reported in the press and national television news suggesting that, as the surgeon general noted, smokers of light cigarettes "might actually be doing themselves more damage by smoking and inhaling more deeply." (Quotation omitted.)

— a September 1982 National Academy of Sciences study concluding that low tar and nicotine cigarettes had "doubtful" health benefits because of the compensation phenomenon. (Quotation omitted). This study was reported in the *New York Times, Boston Globe, USA Today, Washington Post,* and the *Nashua Telegraph,* as well as on national television news outlets..

— a July 1983 study published in the *New England Journal of Medicine* concluding that smokers of light cigarettes inhaled just as much tar and nicotine as smokers of regular cigarettes because of the compensation phenomenon. This study was featured in *USA Today, Newsweek,* and on the national televised news, as well as in various New Hampshire newspapers, such as the *Manchester Union Leader* and *Concord Monitor.*

— the surgeon general's 1983 report, reported in the *Wall Street Journal* and on NBC "Nightly News," which cited studies "showing that users of low-yield cigarettes tend to inhale more intensively, increasing their intake of carbon monoxide, and other gases produced by smoking."

— a 1989 surgeon general report, cited in an April 1994 *Reader's Digest* article, which found "compensatory smoking behavior among smokers who switch to low-tar brands might even increase total tobacco-smoke intake in some smokers."

— an August 1993 study by the American Lung Association, which concluded that the brand of cigarettes smoked had little effect on the amount of tar and nicotine ingested and that Federal Trade Commission smoking machines "do not replicate the smoking behavior of real smokers who may inhale more and hold smoke in longer." This study was reported in *Vogue.*

— based upon studies such as the August 1993 study, ABC News reported in February 1994: "Scientifically, the low-tar, low-nicotine cigarette notion is basically a scam as smokers take a few extra puffs, they inhale a little bit more deeply, they beat the machine, they beat the cigarette, they get all the nicotine their body needs." (Quotations omitted). In March 1994, National Public Radio aired an "extensive report" about the "risks of 'light' cigarettes and . . . the accuracy of [Federal Trade Commission] test measurements of tar and nicotine levels as well as the issue of compensation." PBS's "Frontline" aired a similar report in January 1995, explaining how the smoking machine functions and that "smokers often unconsciously blocked ventilation holes in the filters of light cigarettes to achieve a better tasting cigarette but one with higher tar and nicotine yields."

Professor Greenwood's declaration also describes publications distributed nationally between 1976 and 1995 by the American Cancer Society and

other similar organizations, specifically warning consumers about the compensation phenomenon. For instance, in 1982, the American Cancer Society published a pamphlet that stated: "Too many smokers turn low tar/nicotine cigarettes into high [tar/nicotine cigarettes] by covering the ventilation holes in the cigarette paper or filter that are a major factor in lowering the [tar/nicotine] levels." (Quotation omitted).

In 1993, the National Cancer Institute issued a brochure, which was distributed nationally, and which specifically warned about the compensation phenomenon. The brochure advised smokers to switch to light cigarettes, but then advised: *"do not* smoke more cigarettes, inhale them more often or more deeply, or place your fingertips over the holes on the filters. These actions will increase your nicotine intake, and the idea is to get your body used to functioning without nicotine." (Quotation omitted.)

▐▌ Given the volume of information available to consumers from 1976 to 1995 about the compensation phenomenon, we conclude, as a matter of law, that the number of class members exposed to this information was not *de minimis. See Auger v. Town of Strafford*, 158 N.H. 609, 614 (2009) (although ordinarily we will remand unresolved factual issues, if record reveals that reasonable fact finder necessarily would reach certain conclusion, we may decide such issues as matter of law). Accordingly, we conclude that determining the information about Lights to which individual class members were exposed and what they believed are individual issues that will predominate over common ones. *See In re Ford Motor Co.*, 2012 WL 379944, at *14-*15. "Identifying which putative class members purchased under similar circumstances will require individualized inquiries that are impracticable in class litigation." *Id.* at *15. Therefore, we hold that the trial court unsustainably exercised its discretion when it ruled that issues related to individual class members' injuries could be resolved by common evidence and that common issues would predominate.

*Reversed and remanded.*

HICKS and CONBOY, JJ., concurred.